## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WEST PALM BEACH FIREFIGHTERS' PENSION FUND and CITY OF MIAMI GENERAL EMPLOYEES' & SANITATION EMPLOYEES' RETIREMENT TRUST, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　　　　Plaintiffs,<br><br>　　v.<br><br>HASBRO, INC., CHRISTIAN COCKS, and CYNTHIA WILLIAMS,<br><br>　　　　　　　　Defendants. | Case No. 24-cv-08633<br><br>CLASS ACTION<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ......................................................................................... 1

II.     JURISDICTION AND VENUE ................................................................... 8

III.    PARTIES ...................................................................................................... 9

IV.     SUMMARY OF THE FRAUD ................................................................... 10

        A.      Hasbro Prints and Sells Valuable Magic: The Gathering Cards ........................... 10

        B.      Prior to the Class Period, Magic's Explosive Growth Propels Wizards to
                Become Hasbro's Most Important Division ......................................... 12

        C.      Defendants Attribute Wizards Performance and Magic Growth to a
                Sustainable Consumer Segmentation Strategy ..................................... 13

        D.      Bank of America Reports Hasbro is Overprinting Magic Sets at the Risk
                of Harm to Magic ................................................................................. 16

        E.      Defendants Comfort Investors by Announcing That the Magic 30th Set
                Quickly Sold "Out of Stock" ................................................................ 20

        F.      Defendants Continue to Comfort Investors by Asserting Magic Sets Are
                Printed Pursuant to Segmentation, Not "Overprinted" at the Risk of Harm
                to Magic ................................................................................................ 21

        G.      Unknown to Investors During the Class Period, Hasbro Drove Wizards
                and Magic Growth by Overprinting Magic Sets at the Risk of Harm to
                Magic .................................................................................................... 23

                1.      Unknown to Investors, Hasbro Systematically Overprinted Magic
                        Sets to Compensate for Poor Revenues Elsewhere in the Company ........ 25

                2.      Unknown to Investors, Hasbro Prematurely Stopped the Sale of the
                        Magic 30th Set to Hide Poor Sales, *Not* Because the Set Was "Out
                        of Stock" ................................................................................. 36

V.      THE TRUTH IS GRADUALLY REVEALED AS DEFENDANTS CONTINUE
        TO MATERIALLY MISLEAD THE MARKET ............................................. 38

        A.      The Truth Begins to Emerge, But Defendants Continue to Mislead
                Investors ................................................................................................ 38

        B.      The Truth Continues to Emerge When Hasbro Announces Worse-Than-
                Expected Wizards Revenue ................................................................... 39

C.      The Truth Fully Emerges When Hasbro Reveals Higher-Than-Expected Wizards Inventory Levels ................................................................ 46

VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ........ 47

A.      September 16, 2021 – Investor Call ........................................................ 47

B.      November 11, 2021 – Jefferies Global Interactive Entertainment Conference ............................................................................................. 49

C.      October 18, 2022 – Q3 2022 Earnings Call ............................................ 49

D.      November 28, 2022 – Release of the Magic 30th Set ............................. 50

E.      December 8, 2022 – Hasbro Special Call ............................................... 51

F.      April 27, 2023 – Q1 2023 Earnings Call ................................................ 53

G.      May 3, 2023 – Form 10-Q ...................................................................... 54

VII.   DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS WERE MATERIAL TO INVESTORS ............................................................................... 55

VIII.  ADDITIONAL SCIENTER ALLEGATIONS ................................................... 57

IX.    ADDITIONAL LOSS CAUSATION ALLEGATIONS .................................. 68

X.     CLASS ACTION ALLEGATIONS .................................................................... 73

XI.    INAPPLICABILITY OF STATUTORY SAFE HARBOR ............................. 75

XII.   THE PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ......................................................................................................... 75

XIII.  COUNTS AGAINST DEFENDANTS ................................................................ 77

XIV.   PRAYER FOR RELIEF ...................................................................................... 81

XV.    JURY DEMAND .................................................................................................. 82

Lead Plaintiffs West Palm Beach Firefighters' Pension Fund and City of Miami General Employees' & Sanitation Employees' Retirement Trust (together, "Lead Plaintiffs" or "Plaintiffs"), by and through their undersigned counsel, bring this action for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, against Hasbro, Inc. ("Hasbro" or the "Company"), Christian Cocks, and Cynthia Williams (together, "Defendants"). Lead Plaintiffs bring these claims on behalf of themselves and a class of investors who purchased or otherwise acquired Hasbro common stock between September 16, 2021, and October 26, 2023, inclusive (the "Class Period"), and were damaged thereby.

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based on the independent investigation of Lead Counsel. This investigation included a review and analysis of (i) Hasbro's public filings with the SEC; (ii) research reports by securities and financial analysts; (iii) records and transcripts of investor conference calls; (iv) publicly available presentations by Defendants; (v) press releases, media reports, and industry publications; (vi) securities pricing data; (vii) interviews of Hasbro former employees ("FEs"); (viii) consultation with experts; and (ix) other material and data identified herein. Lead Counsel's investigation into the alleged factual allegations is continuing, and many of the relevant facts are known only by Defendants and are exclusively within their custody or control.

## I.    INTRODUCTION

1.    This case concerns Defendants' false and misleading representations about Hasbro's most important brand, Magic: The Gathering ("Magic"). Magic was a popular card game, with collectors spending thousands of dollars to purchase rare cards on an active secondary market. During the Class Period, securities analysts and investors were acutely focused on whether Hasbro

was overprinting Magic sets, which (if true) would dilute the value of Magic cards and, accordingly, demand for future Magic sets. In response, Defendants assured investors over and over that Hasbro was not overprinting Magic sets; rather, according to Defendants, Hasbro was printing Magic sets pursuant to a carefully thought-out "segmentation" strategy, i.e., printing new Magic sets for the purpose of meeting demand from newly identified consumer segments. But that was not true. In reality, and unknown to investors at the time, Hasbro was overprinting Magic sets, flooding the market with new sets for the purpose of generating short-term revenue to make up for shortfalls elsewhere in the Company's business. Hasbro's overprinting harmed the Magic franchise and left the Company laden with unsold Magic sets. As investors learned the truth, Hasbro's stock price plummeted, erasing over $2.7 billion in shareholder value.

2.      By way of background, Hasbro sells toys and games including Monopoly and Play-Doh. In the years leading up to the Class Period, Magic steadily became the Company's most important brand. Magic is a strategic tabletop role-playing card game in which players collect cards carrying different assigned powers and build custom decks to face off against each other. Magic cards are sold in sets of randomized packs, with each card assigned a level of "rarity" based on the odds that it will appear in a given pack. Since the game's beginning, Magic cards have been collectibles whose value is determined by their scarcity. The great demand for scarce Magic cards among collectors and players supports a robust secondary resale market, keeping collectors and players interested in new sets. In the years before the Class Period, Magic collectors saw the value of some of their rarest cards grow to tens-of-thousands of dollars on the secondary market.

3.      In 2016, Defendant Christian Cocks took over as President of Hasbro's Wizards of the Coast & Digital Gaming ("Wizards") division, which contained the Magic business. Wizards then began to release an increasing number of Magic sets. By 2020, set releases had accelerated

so much that the number of smaller "box set" releases alone was greater than the number of sets of any kind released during any previous year. Thanks to these additional sets, Wizards' revenue doubled between 2018 and 2021, the year the Class Period begins.

4.      In response to keen investor and analyst focus on Magic's astounding growth, Defendants assured the market that this success was the sustainable result of addressing newly identified consumer segments' demand for more Magic sets. Specifically, Defendants attributed the uptick in the number of sets printed, and Magic's consequent growth, to their purported "segmentation" strategy. Under this strategy, Defendants said, Wizards printed "to meet demand" and only released new sets in response to the discrete demands of its four different segments of Magic consumers: collectors, competitive players, casual players, and players of the new online Magic Arena platform.

5.      Throughout the Class Period, commentators and investors credited Defendants' explanations for the additional Magic set releases and the brand's performance. As Wizards' revenue continued to climb, its cheap-to-produce Magic cards fattened the Company's profit margins. Even as Hasbro began to report disappointing results for its Consumer Products division, optimistic analysts expected that Wizards—driven by Magic's purportedly sustainable growth under the print-to-demand segmentation strategy—would see the Company through any trouble.

6.      Befitting Wizards' importance to the Company, Defendant Cocks was appointed Hasbro CEO in 2022. That year, as Hasbro's Consumer Products division suffered from weak sales and persistently elevated inventories, the Company's revenue from Magic **_alone_** climbed to more than $1 billion under Defendant Cynthia Williams, the new President of Wizards. Amid this continued growth—and the Company's October 2022 announcement of a special 30th anniversary

Magic set ("Magic 30th Set") that would be released later that year—Defendants continued to credit "segmentation" for the ever-greater number of Magic sets Hasbro was churning out.

7.    Bank of America analysts, however, sounded the alarm in a November 14, 2022, report. Writing about their investigation into Magic, including conversations with Magic players, collectors, distributors and game stores, the analysts concluded that Hasbro was "***killing its golden goose***" and "***destroying [Magic's] long-term value***" by "***[o]verprinting Magic***" sets. The analysts explained that amid "more frequent" set releases and "more product in each set," consumers with "wallet fatigue" were "cutting back" on purchases. Highlighting Defendants' announcement of the Magic 30th Set, the analysts cautioned that "***the scarcity value of Magic is in question***." As Hasbro "continues to reprint its most successful sets," the analysts warned, it was causing "panic among collectors" and "crash[ing] secondary market prices" among consumers who "can't trust that sets will retain their value." Contrary to Defendants' explanations that Magic's growth had been driven by segmentation—which involved broadening its appeal to different segments of consumers—the Bank of America report further noted that "***Magic has grown primarily by extracting more revenue from each player rather than by growing its player base***." Downgrading Hasbro stock, the analysts urgently cautioned: "***Magic needs to cut print runs to support prices***." In response to these revelations, Hasbro's stock price fell nearly 10%, wiping out approximately ***$875 million*** in shareholder value.

8.    Defendants rushed to comfort concerned investors by denying the Bank of America report's conclusions. They steadfastly assured investors that Magic's growth and set release cadence were driven by "segmentation," ***not*** by "overprinting" Magic sets, and that Hasbro was ***not*** devaluing Magic by printing additional sets.

9.     Given the Bank of America report's conclusions about the damage that "overprinting" could do to the Magic brand, the market watched the November 28, 2022, release of the Magic 30th Set with concerned interest. Defendants allayed those concerns by announcing that the Magic 30th Set was ***"out of stock"*** within half an hour of its release—i.e., that Magic 30th Sets were "not available to buy . . . because they ha[d] all been sold."[1] The announcement was met with applause, with industry commentators issuing reports whose headlines highlighted that "***Magic: The Gathering 30th Anniversary Edition Sells Out In Minutes***" and "***M[agic]: W[izards] Sells Out Of 30th Anniversary Sets In Under An Hour***." Commentators concluded that Hasbro likely sold out of stock of the highly coveted Magic 30th Set so shortly after the sale commenced because "many copies were bought up by those hoping to sell the product at a higher price on the secondary market."

10.     Just days afterward, on December 8, 2022, Defendants convened a special-purpose investor call to further allay investor concern and rebut the Bank of America report's conclusions of "overprinting." On that call, Defendants again assured investors that Magic's growth, and the schedule of Magic set releases, was driven entirely by the much-touted "segmentation" strategy, with Hasbro "***print[ing] and reprint[ing] products to meet demand***." Defendants also credited segmentation for the high number of Magic SKUs (i.e., individual sets) released during the year, flatly asserting that there was "no evidence" that Magic was overprinted. Analysts credited Defendants' denials of the Bank of America report, emphasizing that "player segmentation" was "central to Hasbro's long-term [Magic] strategy."

---

[1] Out of Stock, *Cambridge Dictionary*,
https://dictionary.cambridge.org/us/dictionary/english/out-of-stock (last visited Nov. 26, 2025).

11.     But Defendants' representations were false and misleading. Unknown to investors at the time, it was ***not*** segmentation that was responsible for Magic's growth and set release cadence. In truth, Magic's stunning growth before and during the Class Period had been driven by Hasbro's practice of releasing specific Magic sets that could be thrown together at low cost and on short timelines for the explicit purpose of compensating for revenue shortfalls in other Hasbro divisions. ***This was known internally as the "parachute" strategy***—under which Magic sets could be "parachuted in" to address shortfalls elsewhere in the Company's business. As Hasbro's Consumer Products business floundered during the Class Period, Magic was squeezed tighter for short term cash, with these Magic "parachute" sets accounting for ***46%*** of all Magic set releases in 2022.

12.     Former Wizards employees, including executives who worked directly with Defendants Cocks and Williams, confirmed that Defendant Cocks, both as Wizards President and as CEO, gave the directive to print these parachute sets—and that Defendant Williams and Wizards management specifically knew of the parachute strategy. Hasbro personnel who knew about the parachute strategy acknowledged that the Bank of America report had ***"caught"*** management. Former Wizards employees added that Defendants knew first-hand that their parachute strategy harmed the Magic brand and was leading to lower-than-anticipated demand for future sets.

13.     Lead Counsel's investigation also confirmed that Hasbro's pivotal Magic 30th Set was ***not*** in fact "out of stock" when Defendants publicly represented that it was. Indeed, Hasbro simply posted the "out of stock" message on the Magic 30th Set sale website to falsely convey to the market that sales of the set were strong. As a former Wizards employee working in the Magic 30th Set release day "war room" explained, after initial sales velocities indicated that the set would not sell out of stock, Wizards—at Defendant Williams' direction—prematurely cut off the sale

and posted the "out of stock" message to hide the set's poor performance. Other former Wizards employees corroborated that the set was not "out of stock," with unsold Magic 30th Sets sent off to a Texas landfill.

14.     The truth about Wizards' harmful and shortsighted overprinting strategy—and about the poor sales of the Magic 30th Set—was further revealed to the market on January 26, 2023. On that date, Hasbro announced that Wizards' revenue for the fiscal fourth quarter of 2022 had substantially missed the Company's guidance, and analysts' expectations, by double-digit percentages.

15.     Analysts' reactions to this news were swift and severe. Bank of America analysts immediately reiterated the concerns about Magic they had raised in their November 2022 report. Other analysts also connected those concerns to the disappointing Wizards revenues in reports with titles including "***Tragic the Gathering***" and "***Little Magic to Speak Of***." Noting that "the investment thesis for Hasbro was heavily dependent on where [the] Wizard[s] business is headed" and that Hasbro had "pitched investors on the long run growth and profitability of the Wizards segment," these analysts explained that the Company's announcement confirmed the "***concerns around the outlook for Magic The Gathering***"—and, consequently, "***Hasbro's ability to grow in [20]23***." In the wake of the January 26, 2023, revelation, the price of Hasbro's common stock fell another 8%, wiping out over ***$700 million*** in shareholder value.

16.     Defendants nevertheless continued to mislead investors. Specifically, they assured investors that the Magic sets included in the Company's elevated inventory were "***upcoming*** [Magic] set releases"—***not*** past Magic sets. In truth, however, Hasbro's inventory included leftover sets from past Magic releases that had gone unsold after the Company's overprinting had stifled Magic demand. Former employees who attended executive-level meetings during the Class

7

Period confirmed that Magic sales through the second half of 2022 consistently missed Hasbro's internal demand forecasts. These unsold sets, which could not be offloaded without significant write-downs and discounts, continued to sit in the Company's bloated inventory.

17.     The full truth finally emerged on October 26, 2023. On that date, Hasbro published its earnings report for the fiscal third quarter of 2023 and revealed that, contrary to Defendants' representations, Wizards inventories were stubbornly elevated due to unsold past Magic sets— ultimately causing a decrease in Wizards operating profit "primarily" driven by "inventory obsolescence charges."

18.     In the wake of the October 26, 2023 revelation, the price of Hasbro's common stock fell another 16.3%, wiping out over *$1.2 billion* in shareholder value. All told, Hasbro's stock price fell by more than *34%* as investors learned the real reason for the proliferation of Magic sets and the resulting damage to the Magic franchise, slashing the Company's market capitalization by over *$2.7 billion*.

## II.    JURISDICTION AND VENUE

19.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act. Substantial acts in furtherance of the alleged fraud and effects of the fraud have occurred in this District. Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in substantial part in this District.

22.     In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

23.     Co-Lead Plaintiff West Palm Beach Firefighters' Pension Fund ("West Palm Firefighters") is a benefit pension plan based in West Palm Beach, Florida, that provides pension services and benefits to its firefighters. As set forth herein, and in the Certification previously filed with the Court (ECF No. 22-2), West Palm Firefighters purchased Hasbro common stock at artificially inflated prices during the Class Period, and suffered financial harm as a result of the materially false and misleading statements and material omissions alleged herein.

24.     Co-Lead Plaintiff City of Miami General Employees' & Sanitation Employees' Retirement Trust ("Miami GESE") is a benefit pension plan based in Miami, Florida, that provides pension services and benefits to its general and sanitation employees. As set forth herein, and in the Certification previously filed with the Court (ECF No. 22-2), Miami GESE purchased Hasbro common stock at artificially inflated prices during the Class Period, and suffered financial harm as a result of the materially false and misleading statements and material omissions alleged herein.

25.     Defendant Hasbro, Inc. is a publicly traded toy and game company. Among other product offerings, Hasbro sells sets of Magic cards through its Wizards division. Before and during the Class Period, Magic was a crucial driver of Hasbro's reported revenues and profit margins and was touted as a key component of Hasbro's future.

26.     Defendant Christian Cocks has been Hasbro's CEO since February 2022. Between 2016 and February 2022, Defendant Cocks was President of Wizards. During the Class Period, Defendant Cocks spoke in venues including earnings calls and industry conferences, during which he misled investors to believe that Hasbro printed Magic sets to capture "segmented" demand,

rather than to generate near-term revenue to make up for poor performance elsewhere in the Company.

27.     Defendant Cynthia Williams was President of Wizards from February 2022 to April 2024. During the Class Period, Defendant Williams spoke in venues including earnings calls and industry conferences, during which she misled investors to believe that Hasbro printed Magic sets to capture "segmented" demand, rather than to generate near-term revenue to make up for poor performance elsewhere in the Company.

28.     Defendants Cocks and Williams (the "Executive Defendants") directly participated in the management of Hasbro's operations, had direct and supervisory involvement in Hasbro's day-to-day operations—including the operations of the Magic business—and had the ability and ultimate authority to control, and did in fact control, the Company's statements to investors, including statements made via the Company's website. The Executive Defendants were involved in drafting, reviewing, authorizing, publishing, and making the Company's public statements, including the false and misleading statements and omissions alleged herein.

## IV.    SUMMARY OF THE FRAUD

### A.    Hasbro Prints and Sells Valuable Magic: The Gathering Cards

29.     Hasbro's operations are separated into three primary revenue-generating business segments: (i) Consumer Products, which contains toy and game brands like NERF and Play-Doh; (ii) Entertainment, which includes the Company's movie and television productions; and (iii) Wizards of the Coast and Digital Gaming ("Wizards"), which contains the Company's massively successful Magic: The Gathering ("Magic") brand.

30.     Magic, one of Hasbro's juggernaut "Franchise Brands," is a tabletop card-based strategy game in which players build and deploy decks of cards that each confer different powers and abilities. After its creation in 1993, Magic fostered a huge worldwide player base and a

dedicated community of collectors. Magic sells cards to both players and collectors in sets of randomized packs. Each card is assigned a certain rarity—"common," "uncommon," "rare," or "mythic rare"—based on the odds that it will appear in a given pack.

31.     Magic cards are collectibles whose value on the secondary market is tied to their scarcity. Connected by a nationwide network of hobby shops and card dealers, Magic collectors steadily drove up the value of rare cards on the active secondary resale market in the years before the Class Period. Secondary market prices for cards regularly fetched hundreds of dollars, while more coveted and rarer cards sold for tens-of-thousands of dollars. By mid-2021, just before the beginning of the Class Period, a Black Lotus, one of the rarest—and thus most valuable—Magic cards ever produced, was sold on the secondary market for $800,000.

32.     Because the secondary market value of each Magic card is tied to the number of existing copies of the card, the most frequently reprinted cards—i.e., the most common—are also the cheapest. Before the Class Period, Wizards sometimes released sets containing reprints of certain Magic cards. Each such set containing reprints has the potential of diluting the value of every circulating copy, harming Magic collectors who have bought cards precisely because of their scarcity. An article in an industry publication titled "Everything You Need to Know About Reprints in Magic" put it simply: "The worst thing about reprints is that they affect the secondary market and . . . can devalue a player's collection."

33.     Hasbro knew that if Magic's secondary market values were diluted too severely by the release of reprint sets and other new sets, Magic buyers would lose confidence that their retail card purchases could retain and increase their value, and Magic sales would drop as a result. The Company thus assured investors and Magic buyers that its reprint policy was geared to support consumers' "confidence in [Magic] as a collectible."

11

B.     **Prior to the Class Period, Magic's Explosive Growth Propels Wizards to Become Hasbro's Most Important Division**

34.     When Defendant Cocks was appointed President of Wizards in 2016, the division was still a relatively minor contributor to Hasbro's financial success. In the years leading up to the Class Period, however, Wizards began to grow at such a fast clip that the Company projected the division's revenue would double between 2018 and 2023. Wizards then met its goal to double revenue in 2021, well ahead of schedule.

35.     In 2021, while Hasbro's Consumer Products division accounted for a plurality of the Company's net revenue, Wizards, with its extremely high-margin Magic sets, accounted for an outsized share of Hasbro's reported operating profit. In fact, in 2021, Wizards accounted for $547 million of the Company's reported $763.3 million operating profit. The headline of a July 26, 2021, J.P. Morgan report analyzing the Company's results for the fiscal second quarter of 2021 aptly summed up an increasingly common phenomenon: "***Wizards of the Coast Drives Blowout Quarter***."

36.     In 2021, Magic was a key driver of Wizards' success—and thus the success of the Company as a whole. That year, Magic ***alone*** contributed approximately 15% of Hasbro's ***total*** net revenue. Indeed, in its 2021 Annual Report, Hasbro announced that Wizards "had its ***best year ever***, doubling the size of the Wizards business two years earlier than anticipated," thanks to stunning revenue growth of ***42%***—by far the greatest increase in revenue of any of the Company's divisions that year. Looking toward even greater future Wizards growth, the report touted Hasbro's "***significant plans to leverage the power of Wizards' brands . . . in bigger and more powerful ways for years to come***." The Annual Report further touted the Company's "focus on growing [the Magic] business," adding that Hasbro had "***[i]nvested nearly $1B in [Magic] over [the] past five***

*years to drive 150% revenue growth*." The report also noted that Magic, "Hasbro's largest gaming brand," had "ended 2021 *just shy of the $1 billion revenue mark*"—Magic's "*best year ever*."

37.     Thus, by the start of the Class Period in late 2021, analysts and investors were highly focused on Wizards and Magic in evaluating the Company's overall health and financial outlook. For example, in a report by UBS, analysts stated that "*upside in [the Wizards] statement [wa]s a key part of [their] thesis*" and resulting *"Buy"* recommendation.

### C.    Defendants Attribute Wizards Performance and Magic Growth to a Sustainable Consumer Segmentation Strategy

38.     During the Class Period, Defendants regularly touted Magic's growth and revenue drivers, which, due to Magic's preeminence within Wizards, also drove Wizards' performance. According to Defendant Cocks, Hasbro had driven Magic's growth through "segmentation," a strategy under which Hasbro only printed more new Magic sets for the purpose of filling the discrete demands of newly defined segments of Magic fans. In addition to competitive players, these segments included collectors, casual "social" players, and players of the new online Magic Arena platform.

39.     Throughout the Class Period, Defendant Cocks assured investors and analysts that the increased number of Magic set releases, and Magic's and Wizards' meteoric rise, had been driven by this print-to-demand segmentation strategy. For example:

- On a September 22, 2021 call hosted by Stifel, Nicolaus and Co., Defendant Cocks stated, "We've been driving our growth to date on kind of a play-based segmentation," and explained that "*the real growth and the real driver for [Magic] has been thinking about things on a segmented basis*."

- At the November 11, 2021 Jefferies Global Interactive Entertainment Conference, Defendant Cocks was asked to "talk a little bit about how the [Hasbro Brand] Blueprint allows [Magic] to experience that explosive growth," and responded, "*We drove all new segmentation for how we think about our product lines*."

13

40.     In February 2022, Hasbro appointed Defendant Cocks its new CEO and picked Defendant Williams to succeed Defendant Cocks as President of Wizards. In the wake of Defendant Cocks' appointment as CEO, investor focus on Wizards only grew. Just days into Defendant Cocks' tenure as CEO in February 2022, activist firm Alta Fox, which owned 2.5% of the Company, argued that Wizards was "undervalued given its higher growth and margin profile compared to Hasbro's other segments," pointing out that "the vast majority of Hasbro's overall revenue & EBITDA growth c[ame] from W[izards] over the last decade."

41.     Analysts from D.A. Davidson agreed with Alta Fox's thesis, arguing in a February 18, 2022 report that "the market's valuation of H[asbro] does not reflect the high growth and profitability of Wizards." The report also stated that "***investors' eyes are now more focused on what the Wizards business means for H[asbro] long-term***." This interest only grew after a second activist investor, Ancora Holdings, echoed Alta Fox's comments in May 2022.

42.     Now under Defendant Williams' leadership, with Defendant Cocks as CEO, Wizards continued to pump out Magic sets, releasing a record 39 separate sets of Magic cards in 2022.  These releases included not only the traditional expansion sets, but also a series of box sets, as well as compilation sets, supplemental sets, and digital sets.

43.     Meanwhile, Defendants continued to claim that segmentation was driving the number of Magic sets released, and thus Magic's and Wizards' growth. At the Company's October 4, 2022 Investor Day, for example, Defendant Cocks stated that in 2016, Wizards had realized "huge value unlock" of being able to "***segment [fans] and build bespoke products for them***," and that this segmentation had in turn "***kicked off the best growth spurt that we've ever had"—one "[t]hat endures to this day.***" At the Investor Day Presentation, Defendants specifically called out "Secret Lair" Magic sets—which comprised a growing number of Magic's annual set releases and

14

had purportedly been produced pursuant to the segmentation strategy—as an example of one of the "*pillars of [Hasbro's] growth*." Defendant Williams echoed to investors that Hasbro was "forecasting double-digit growth for [Magic] this year" and had "*plans to continue this growth*," also citing Secret Lair sets as a specific "growth opportunity."

44.    Analysts reacted accordingly, singling out Wizards as the key to the Company's future against a backdrop of persistent inventory and revenue struggles in Hasbro's Consumer Products division. For example, Bank of America analysts adopted the Company's projection that over the next three years, "[r]evenue growth w[ould] be higher in the Wizards segment" than for the Company as a whole. Jefferies analysts likewise noted that "[f]ocus" was "tighten[ing] on margin-rich franchise brands" like Magic.

45.    Defendants also used the Investor Day presentation to tout the latest Magic offering: a special 30th anniversary Magic set ("Magic 30th Set") that Defendants announced would debut later that year. Defendant Williams assured investors that the set was produced pursuant to the segmentation strategy, calling it "our most exciting **collector product** ever." Defendant Cocks told investors that the Magic 30th Set—which would contain reprints of 60 rare cards and cost $999—would be "the first time our fans can buy the iconic card, the Black Lotus, in over 25 years."

46.    This announcement sparked questions from members of the Magic fan community, who expressed concerns about the growing number of annual Magic releases. As Magic news site MTGRocks put it, "*[d]ue to the steep increase in the number of products being released annually, many players fear that it's already impossible to keep up*, let alone collect everything."

47.    However, when pressed on whether Magic was printing too many sets, Defendants assured investors that it was not. For example, on the Company's October 18, 2022, earnings call,

an analyst asked Defendant Williams about "investor concern that there's maybe been ***too many Magic releases in a short time frame***" and "talk of wallet fatigue among the players out there." In response, Defendants denied that Hasbro was printing too many Magic sets and refuted any concerns about "wallet fatigue." Defendant Cocks touted Magic's "great growth," and Defendant Williams reassured investors that there were "***the same number of sets happening in a year***."

48.    Based on these representations, analysts believed the future was bright for Magic because the Company was producing Magic sets pursuant to the sustainable segmentation approach and ***not*** risking Magic's long-term value by overprinting sets for the purpose of counteracting sluggish performance in Hasbro's other business areas. Analysts consequently forecasted excellent revenue growth for Wizards in the fiscal fourth quarter. BMO Capital Markets analysts, for example, estimated that Wizards' fourth-quarter 2022 revenue growth would hit 36%.

**D.    Bank of America Reports Hasbro is Overprinting Magic Sets at the Risk of Harm to Magic**

49.    On November 14, 2022, Bank of America analysts published a bombshell, deep-dive report into Hasbro's Magic business (the "BofA Report"). Based on their analysis of the number and cadence of Magic releases—and their on-the-ground investigation, which included visits to retailers and conversations with local hobby shops at the center of Hasbro's nationwide sales network—the BofA Report exposed a "primary concern": that "***Hasbro has been overproducing Magic cards which has propped up Hasbro's recent results but is destroying the long-term value of the brand***."

50.    Noting that Magic was key to Hasbro's success—comprising roughly 15% of Hasbro's revenue and 35% of the Company's EBITDA—the BofA Report recounted its recent growth, stating that "Magic sales nearly doubled over the course of the pandemic" and that "Hasbro has kept the growth going with more frequent set releases, more product in each set and wider

distribution." The Bank of America analysts discovered, based on their investigation, that this "increased supply" had "**caused distributors, collectors and local game stores to lose money on Magic**." Because of these Magic buyers' "**growing frustration**" with the ballooning number of Magic sets, the analysts concluded, "**we expect they'll order less product in future releases**."

    51.    As depicted below, the BofA Report highlighted the approximately **150% increase** in the number of Magic sets released each year between 2019 and 2022:



    52.    The greatly increased number of sets released—from 15 in 2019 to 39 in 2022—supported a key conclusion of the BofA Report: "**Magic has grown primarily by extracting more revenue from each player rather than by growing its player base**" through "a combination of **increased set releases and increased price per set**." The report pointed out that while Wizards revenue was "up 65% vs. 2019 to-date," consumer interest in Magic was only up 15% over that

same span. This conclusion conflicted directly with Defendants' repeated representations that Hasbro had printed more new Magic sets to meet demand from new consumer segments.

53.     The BofA Report flatly stated, "***Wizards has overprinted cards beyond demand***." Not only were the number of new set releases up—"several times this year," the report noted, "Wizards has printed and released more of both their most popular set releases . . . through third party distributors, and less popular ones . . . through product dumps on Amazon." The report concluded that these practices had "***benefited Wizard's revenue, but in the process, destroyed secondary market values***"—the result of diluting the scarcity that drove Magic resale prices.

54.     Indeed, the report noted, "***[s]even of the past eight major set releases have seen prices decline from their initial levels*** with declines ranging from -11% to -57%," and "stores, collectors, and players ***can't trust that sets will retain their value***." Based on the Bank of America analysts' investigation, including industry checks of retail locations that carried Magic sets, the BofA Report stated that "***sell-through has been weak with unpopular sets from last year***," and that "national retailers [such as Target, Walmart, Best Buy, and GameStop] are ***reducing Magic shelf space***." Further, the report said, "those [retailers] that continue to carry [Magic] are ***heavy with aged inventory***."

55.     The BofA Report focused specifically on the special Magic 30th Set that Defendants had announced in October, which was due for release in November. The BofA Report cautioned that the $999 price for four booster packs was "excessively high" compared to the $5 cost of "a typical set pack," and emphasized that "the set also includes Reserved List cards ***which Hasbro had promised to never reprint***." The report noted that the announcement of the Magic 30th Set was further "encouraging more players to use 'proxies', which are unsanctioned cards not produced by Wizards."

18

56.     The BofA Report's bolded headlines repeated its core message: "***Overprinting Magic destroys its long-term value***" and "***Magic needs to cut print runs to support prices***." Accordingly, the Bank of America analysts cut Hasbro's price target ***from $73 to $42*** per share and changed the Company's stock rating ***from "Buy" to "Underperform."***

57.     The BofA Report sparked considerable investor concern. In the days after the report was published, commentators questioned whether Magic sets were produced pursuant to the Company's purported segmentation strategy, as Defendants had represented, or whether Magic sets were instead overprinted and thus harming the value of the Magic brand, as the report had shown. On November 18, 2022, for example, *Barron's* published an article titled "***Hasbro Won Big With a Role-Playing Game. Is It Now Diluting the Magic?***" The article posited that falling values among rare, collectible Magic cards, such as a 42% drop in the value of Black Lotus, the game's most sought-after card, supported the BofA Report's conclusions.

58.     The *Barron's* article also quoted a Magic fan, who described the situation succinctly: "Hasbro effectively has a license to print $100 bills and put them in plastic packs," but "if they cross too many lines with regard to" reprinting cards and overprinting sets, "***it will set off a financial collapse and ruin the game.***"

59.     Similarly, as reported in an MTGRocks article published the day prior, dedicated fans were commenting: "I'm just getting burned out and don't enjoy [Magic] as much as it used to be with slow set prereleases." MTGRocks echoed the BofA Report's focus on the "much-mired 30th Anniversary Edition" set, cautioning that it had "united the Magic: the Gathering community in hatred," and concluding that Magic "***seems to be on the precipice of disaster***."

**E.      Defendants Comfort Investors by Announcing That the Magic 30th Set Quickly Sold "Out of Stock"**

60.     In the wake of the BofA Report, Defendants steadfastly disputed its accuracy by again asserting that Magic sets were produced pursuant to the Company's print-to-demand segmentation strategy—***not*** to generate short-term cash to make up for shortfalls elsewhere in the Company—and representing to the market that sales of the controversial Magic 30th Set had ***not*** suffered from the Magic brand devaluation the BofA Report had predicted.

61.     The Magic 30th Set was released on November 28, 2022. The sale went live online at 9:00am Pacific time and, after only roughly half an hour, the closely watched release website—whose contents were subject to the ultimate authority of Defendants Cocks and Williams—was updated to reflect that the set was purportedly "out of stock."

62.     Based on Defendants' representations, market participants were led to believe that the Company had in fact sold out its production run of Magic 30th Sets. Indeed, that day, industry news site TheGamer published an article titled "***Magic: The Gathering 30th Anniversary Edition Sells Out In Minutes***." Likewise, a BoLS article published the same day was titled "***M[agic]: W[izards] Sells Out Of 30th Anniversary Sets In Under An Hour.***" In an article published the next day, November 29, industry publication Gamespot wrote that "***[j]ust hours after orders went on sale on November 28, the sets were sold out***," and linked to the sale webpage displaying the "out of stock" message. The same day, another industry publication issued an article titled "Fan outrage peaks as ***MTG Anniversary Edition sells out in a flash***," explaining that Hasbro likely went out of stock of the highly-coveted Magic 30th Set so shortly after the sale commenced because "many copies were bought up by those hoping to sell the product at a higher price on the secondary market."

20

63.    While the market believed that the Magic 30th Set had, indeed, sold out—and thus that Hasbro's production of additional sets was not hurting the brand as predicted in the BofA Report—some commentators raised questions. Fans of Magic questioned whether the set had truly "[s]old [o]ut in 35 [m]inutes," given the negative reaction of many players to the set's original announcement. Others noted that the approximately one-minute wait time (i.e. the amount of time purchasers had to wait in the queue before they could buy the set) was "suspiciously low" compared to popular product releases in the past, including "the very recent [Magic] [A]dvent [C]alendar" release. Another commenter noted that *Hasbro's next "[e]arnings report will tell us whether they sold out or just prematurely stopped the offer."*

64.    Defendant Williams, responding to these questions during a call hosted by UBS days after the release of the Magic 30th Set, publicly assured investors that the Magic 30th Set had indeed sold "out of stock." She assured investors that Hasbro had "listen[ed] to customer feedback" well in advance of the set's release and intentionally "*scaled back the expected supply*" of the Magic 30th Set "*to ensure a great collector experience*." As a result, investors were comforted into believing that the Magic 30th Set was in fact a smashing success—so much so that Hasbro was "out of stock" less than an hour after the sale went live.

**F.    Defendants Continue to Comfort Investors by Asserting Magic Sets Are Printed Pursuant to Segmentation, Not "Overprinted" at the Risk of Harm to Magic**

65.    Defendants also continued to dispute the accuracy of the BofA Report and denied that Hasbro had "overprinted" Magic sets at the risk of harm to the Magic franchise. On December 8, 2022, Hasbro convened an investor call "focus[ed]" on Magic "and Hasbro's long-term strategy for its gaming business." An industry publication reported that the call was scheduled because "Hasbro's investors" were "preoccupied with M[agic] reprinting and valuation."

21

66.     During the investor call, Defendants vehemently denied the BofA Report's accusations of "overprinting." Asked about the "claim that you're printing too many cards," Defendant Williams stated flatly: "*[T]here is no evidence that MAGIC is overprinted*." Contrary to the BofA Report's conclusion that Wizards was printing "too many" Magic sets and was thereby risking harm to the future value of the brand, Defendant Williams assured investors, "*[W]e print and reprint products to meet demand from our players*."

67.     Asked about what "could drive MAGIC over the next couple of years," Defendant Cocks reiterated that the "strategy at Wizards" was "*growing that [Magic] player base*"—not, as the BofA Report had concluded, "extracting more revenue from each player rather than by growing its player base." Defendant Williams assured investors that "[Magic's] product release schedule really reflects" that Magic's "*growth has come from monetizing more player segments*."

68.     Asked whether Wizards was releasing "more [Magic] product this year," Defendant Williams attributed a "*shift in how many SKUs we release[] in a year*" to "*our customer and product segmentation strategy*." Defendant Williams also reassured investors that Wizards had "expanded the number of booster product types" and "smaller print run products" released during the year in order "*to meet player preferences*." By making these statements, Defendants led the market to believe that Hasbro was producing Magic sets pursuant to print-to-demand segmentation, and *not*—as the BofA Report had concluded—pursuant to a shortsighted "overprinting" strategy that accelerated set releases at the risk of harm to the Magic brand.

69.     In a report released the next day, UBS analysts reiterated Defendants' denials nearly verbatim. The UBS report credited "player segmentation" as "central to Hasbro's long-term [Magic] strategy" and reported that Magic sales "*reflect real demand*." Echoing Defendants' announcement earlier in the quarter that Magic would become Hasbro's first billion-dollar brand

by the end of 2022, the report highlighted "Hasbro's doubling of the Magic The Gathering business since 2018, earlier than initial targets."

70.     Other news outlets also echoed Defendants' denials. For example, CNBC published an article titled "***Hasbro defends Magic: The Gathering strategy, says 'there is no evidence' cards are overprinted.***" The article explained that Hasbro had "refuted criticism that it is printing too many card sets," highlighting Defendant Williams' statement that "the company prints to meet demand" against the backdrop of the BofA Report—in which, the article noted, "Bank of America [had] downgraded Hasbro . . . saying the company was 'killing its golden goose.'"

71.     Crediting Defendants' continued reassurances that Hasbro was printing more Magic sets pursuant to its print-to-demand segmentation strategy, and ***not*** to generate short-term revenue to cover for shortfalls elsewhere in the Company, analysts continued to project strong Wizards results for the final quarter of 2022. BMO Capital Markets analysts forecasted 36% year-over-year Wizards growth. Other analysts, such as those from Goldman Sachs, projected even better growth. Indeed, even the lowest expectations for the quarter's Wizards performance, from D.A. Davidson analysts, projected that Wizards' revenue would grow by 25%.

### G.      Unknown to Investors During the Class Period, Hasbro Drove Wizards and Magic Growth by Overprinting Magic Sets at the Risk of Harm to Magic

72.     As explained herein, Defendants repeatedly denied suggestions that Hasbro overprinted Magic sets, assuring investors that, pursuant to the Company's purported segmentation strategy, the production levels and release cadence for Magic sets were exclusively keyed to demand—not to generate short-term revenue to cover for shortfalls elsewhere in the Company. Unknown to investors during the Class Period, however, this was not true. In truth, the Company overprinted Magic sets—at the risk of harm to Magic sales and the Magic brand—to soften the

blow of poor results elsewhere in the Company, and especially in its struggling Consumer Products segment.

73.    Specifically, Defendants devised and implemented a so-called "parachute" strategy, by which Wizards produced high-margin Magic sets that it could parachute into the market whenever Hasbro saw or anticipated poor performance elsewhere in the Company. The Executive Defendants themselves oversaw and implemented this strategy, and Defendants were aware of the risk that it would harm the Magic brand and Magic sales—and that those harms had begun to materialize. Indeed, when the BofA Report concluded that Hasbro was "overprinting" Magic sets and threatening the value of the franchise, there was recognition within the Company that **management had gotten "caught."**

74.    Also unknown to investors during the Class Period, the highly-watched Magic 30th Set did **not** in fact sell "out of stock" on the day it was released—and the available supply of the Magic 30th Set had **not** been "scaled back" in response to fan feedback, as Defendant Williams had falsely represented. In truth, when immediately weak sales velocities on the day the Magic 30th Set was released indicated that the set would sell poorly, Defendants prematurely stopped the sale to cover up the set's failure and later disposed of already-produced cards they had left unsold. By falsely announcing that the set had sold "out of stock," Defendants perpetuated the fiction that the Magic 30th Set, like all Magic sets, was produced to meet demand pursuant to Hasbro's purported segmentation strategy, and not to generate short-term revenue to compensate for poor performance elsewhere in the Company.

75.    Lastly, also unknown to investors during the Class Period, the Magic sets in Hasbro's persistently bloated Wizards inventory did **not** consist only of sets produced in anticipation of upcoming releases, as Defendants misleadingly represented to investors. In truth,

elevated Wizards inventories were due to unsold Magic sets from past releases. By 2022, as the Company's parachute strategy of overprinting Magic sets began to harm the Magic brand—as the BofA Report had predicted—sales numbers for Magic sets consistently missed Hasbro's forecasts. Contrary to Defendants' representations to investors, these unsold sets caused stubbornly high Wizards inventory levels—which ultimately caused a decrease in Wizards operating profit "driven primarily" by "higher inventory obsolescence charges."

### 1. Unknown to Investors, Hasbro Systematically Overprinted Magic Sets to Compensate for Poor Revenues Elsewhere in the Company

76.     Beginning during Defendant Cocks' tenure as Wizards President, and continuing through the Class Period, Hasbro printed ever-greater numbers of Magic sets for the purpose of generating short-term cash to make up for revenue shortfalls elsewhere within the Company—all at the risk of harm to the value of the Magic brand.

77.     Lead Counsel spoke with FE 1, who served as Wizards Vice President and member of Hasbro's Extended Leadership Team ("XLT") during the Class Period.[2] FE 1 was directly involved in Magic's production and worked closely with Defendant Williams. FE 1 stated that in 2018, Hasbro began to oversaturate the market with Magic cards—which were a cash cow for the

---

[2] FE 1 served as Wizards VP beginning in September 2021 until he left the Company in July 2025. In this role, FE 1 was a member of Hasbro's Extended Leadership Team, met regularly with and reported to Defendant Williams, worked closely with other Hasbro executives including Wizards SVP Bill Rose and Magic Franchise Leader Ken Troop, and was regularly briefed on discussions in executive-level meetings and board meetings by Defendant Williams and others. During the Class Period, FE 1's responsibilities included reviewing the "rhythm" of business for Hasbro, instituting weekly business reviews and monthly finance reviews, helping the Company get a handle on inventory, arranging board meetings and global commercial meetings, performing long-range planning for Defendant Williams—and helping to create new Magic sets at Defendant Cocks' direction for the purpose of generating short-term revenue for the Company to mask revenue shortfalls elsewhere. Prior to his tenure as Wizards VP, FE 1 served in roles related to Magic research, design, and creative direction from July 2017 to September 2021.

To maintain anonymity, Lead Counsel refers to all former employees herein with male pronouns.

Company—in order to compensate for falling financial performance in Hasbro's other business segments.

78.     In fact, FE 1 said, Wizards created specific Magic SKUs (i.e., sets of cards) that could be quickly manufactured and dropped into the market to make between $40 and $80 million in the event of a revenue shortfall elsewhere within the Company. FE 1 recalled that Bill Rose, Senior Vice President for Magic, called this practice "***Project Parachute***."

79.     FE 1 stated that in the initial years in which he was aware of this practice, the "parachute" sets were generally "Masters" sets. As FE 1 explained, Masters sets consist of card reprints and carry very low production costs, and could therefore be produced easily on compressed production timelines to generate revenue in quarters when the Company needed it. FE 1 stated that while Masters sets had been sold before the Company began to produce parachute sets, the Masters sets produced as parachute sets also carried higher price tags.

80.     The history of Magic's set releases is consistent with FE 1's account that the Company overprinted Masters sets during Defendants' respective tenures as Wizards Presidents. Prior to 2016, Wizards released only two physical Masters sets, one in 2013 and one in 2015. Wizards thereafter began to release Masters' reprint sets at a much faster clip. The Company released one Masters set in 2016, another in 2017, two Masters sets in 2018, a "Double Masters" set containing double the ordinary number of rare cards in 2020, and a specialty "Remastered" reprint set in 2021. In 2022, the year Defendant Cocks took over as CEO, Wizards released two unusually large reprint Masters sets: one Double Masters set, and another set, Innistrad: Double Feature, that contained complete reprints of two past sets—an unprecedented release that did not fit into any established category of prior Masters releases. Including digital set releases, between

2016 and 2023, Hasbro churned out **nearly double the number of Masters reprint sets** it had released **any time** prior to 2016.

81.    FE 1 explained that the parachute strategy was supposed to be something Wizards did for Hasbro to generate short-term revenue if necessary, but that it in fact happened every year. FE 1 recalled that even before Defendant Cocks was CEO, Hasbro's former CEO would tell Defendant Cocks that, for example, Hasbro needed $80 million in additional revenue because something else within the Company had flopped. Defendant Cocks would then tell Magic SVP Bill Rose, or FE 1 himself, to make new cards to "parachute" in because the parent Company had messed up again.

82.    FE 1 added that, in general, Bill Rose was the conduit for all the orders given to Wizards by Defendant Cocks regarding putting out more parachute sets of cards in specific quarters. Defendant Cocks would point to a quarter and tell Rose the amount of money he needed dropped into a specific quarter or on a particular timeline, and the leadership of Magic would then have to reverse engineer a product to fulfill that order from Defendant Cocks. FE 1 used the term "roadmap padding" in describing this practice.

83.    FE 1 stated that after Defendant Cocks became CEO, the parachute strategy of forcing Magic cards into the pipeline to make up for revenue shortfalls elsewhere was integrated into the wider business plan of the Company. FE 1 explained that beginning in 2019, but really hitting stride after Defendant Cocks became CEO, releases of Secret Lair sets—smaller, supplemental sets of reprinted Magic cards—became a more standardized way for the Company to overprint parachute Magic sets.

84.    Corroborating FE 1's account, after the introduction of Secret Lair in 2019, the number of Secret Lair set releases skyrocketed under Defendants Cocks and Williams. In 2019,

the Company released only one Secret Lair set, as well as seven other "box sets." Thereafter, the Company released fifteen Secret Lair sets in 2020, eleven in 2021, and fourteen in 2022. Without Secret Lair sets, the total number of annual Magic box set releases would have risen from five in 2016 to just twelve in 2022. Including Secret Lair, the Company released a total of ***twenty-six*** box sets in 2022—***over <u>five times</u> as many box sets*** as it had released in 2016, the year Defendant Cocks became Wizards President. And while the reprinted cards in these Secret Lair sets had initially come with alternate art—different from that on the original cards being reprinted—the "premise of only reprints with alternate art was abandoned" in October 2020.

85.    Further corroborating FE 1's account that Secret Lair sets were used to make up for missing revenue each year is the fact that release dates for these easy-to-produce sets were heavily weighted toward the fiscal fourth quarter each year, i.e., the quarter that determined whether Hasbro would meet its financial guidance for the year. The very first Secret Lair set was released in December 2019. In 2020, three Secret Lair sets were released in October and November alone. In 2021, the Company released two Secret Lair sets in October and ***three more*** in November alone. In 2022, the Company released two Secret Lair sets in October, two more in November, and a final one in December—the very first December Secret Lair release since 2019.

86.    FE 1 further explained that the set Commander Legends: Battle for Baldur's Gate ("Baldur's Gate"), released in mid-2022, was another parachute set. FE 1 stated that Baldur's Gate was produced on a rushed timeline of about one year—as opposed to the two-year production timeline for most Magic sets—so that it could be released by mid-2022, and therefore move up the cadence of some of the Company's revenue for the year. FE 1 added that he learned from Bill Rose about the use of Baldur's Gate as a parachute, and that there were extensive conversations within

Wizards about the importance of the release coming in the second quarter and the wider need to move revenue up to the year's fiscal second quarter.

87.     Hasbro printed parachute sets like Baldur's Gate ***not*** as part of its "segmentation" strategy to "meet demand," as it assured investors during the Class Period, but rather to generate short-term cash—all at the risk of the Magic franchise's future. FE 1 stated that apart from extra revenue generation, there was no other reason to make the Baldur's Gate set, as the Company had already made a similar set that covered the same ground as Baldur's Gate. FE 2, who worked as a Community Manager for Magic during the Class Period, corroborated FE 1's recollection, citing "Commander Legends" sets like Baldur's Gate as examples of Magic sets full of reprints that could be pumped out on rushed production timelines to generate revenue when it was needed.[3]

88.     The Magic 30th Set released on November 28, 2022 was yet another parachute set. FE 1 confirmed that the Magic 30th Set was a parachute set, created and sold because Wizards was asked to make up for a revenue shortfall elsewhere in the Company. FE 1 described how this set came about: Bill Rose came to the Magic studio in mid-2022 and said that Hasbro was "putting out the hat" for ideas as to how the Company could generate more revenue in the fourth quarter of 2022. The Magic studios were already stretched thin, but Mark Hagan, head of Secret Lair, came up with the idea for a 30th anniversary Magic set. FE 1 stated that he, Defendant Williams, Bill

---

[3] FE 2 was a Wizards Community Manager for Magic from August 2021 through December 2023. In this role, FE 2 reported to Magic Communications Director Blake Rasmussen and Marketing Director Bryan Nisperos, who in turn reported to Defendant Williams. FE 2's responsibilities included extensive communication in person and via social media with Magic players and other Magic buyers, moderating online Magic communities including on Discord, establishing Magic social media accounts, and gathering and aggregating Magic consumer sentiment and feedback into weekly reports using the community reporting software Sprinkler. During the Class Period, FE 2 attended weekly meetings with Nisperos, Rasmussen, and others in which participants discussed Magic consumer feedback, as well as Wizards town hall meetings with Defendant Williams, in which he raised Magic consumers' concerns directly to Defendant Williams.

Rose, and Ken Troop were in the meeting where Magic 30th Set was approved—and that Rose discussed the plan to use the Magic 30th Set as a parachute with Defendant Cocks.

89.     FE 1 stated that Wizards thus began work on the Magic 30th Set in the summer of 2022, to get the associated revenue on the books before the end of 2022, and that Magic was the only product that could make that happen. FE 1 recalled that Defendant Williams was concerned that the Magic 30th Set could backfire and suffer from poor sales because the parachute set comprised non-playable cards that had no actual value but were being sold for $1,000.

90.     By 2022, the parachute strategy was in full swing and accounted for a significant proportion of the Company's total number of annual Magic set releases. Indeed, that year, the Company released a record of ***thirty-nine*** different sets. Of these, per the account of FE 1, parachute sets accounted for at least ***eighteen*** set releases between Masters, Secret Lair, Baldur's Gate, and the Magic 30th Set—approximately ***46%*** of Magic sets released in 2022.

91.     The parachute strategy was well known within the Company, as was the risk that printing parachute Magic sets to generate short-term revenue would negatively impact the Magic franchise. FE 3, who was a Senior Vice President at Hasbro throughout the Class Period, knew that revenue from Magic sets was used to compensate for revenue shortfalls in the Company's Consumer Products division.[4] FE 3 attended quarterly business review meetings with Defendant Cocks and other Hasbro executives, during which he saw presentations from the Wizards side of the business, including presentations about Magic and the cadence of Magic set releases. FE 3

---

[4] FE 3 was a Senior Vice President at Hasbro throughout the Class Period and served in various other roles at the Company through a cumulative tenure of over 20 years. In his role during the Class Period, FE 3 attended regular quarterly business review meetings with Defendants and other Hasbro executives, worked closely with Defendants Cocks and Williams, and was privy to information regarding Defendants' involvement in Wizards as described herein.

recalled that some of these meetings featured discussions of the "parachute" strategy. FE 4, who attended weekly executive leadership team meetings with Defendants during the Class Period, similarly stated that participants in these meetings discussed producing more SKUs to generate more revenue.[5]

92.     FE 5, who served in management-level marketing roles at the Company during the Class Period, further corroborated that knowledge of Hasbro's overprinting of Magic sets was widespread within the Company.[6] FE 5 confirmed that he was familiar with the term "parachute," as used to describe Magic sets, and that he learned through conversations with Wizards' team in Italy that, by 2021, Hasbro's accelerated printing of Magic sets threatened to dilute the values of Magic products on the secondary market. FE 5 stated that it was "common knowledge" that reprinting sets drove down secondary market prices.

93.     When Defendant Williams joined the Company as the new President of Wizards in February 2022, Defendant Cocks introduced her to the parachute strategy. As Defendant Williams

---

[5] FE 4 was a Senior Director of Marketing at Wizards from May 2022 through June 2024. In this role, FE 4 was responsible for customer relationship management and growth, as well as social media and email marketing. During the Class Period, FE 4 attended weekly executive leadership team meetings with Defendants and other Hasbro executives and directors, through which he was privy to sensitive business information, including information about Magic consumer demand, upcoming Magic releases, and sales numbers for past Magic sets presented by people including Elaine Chase, VP of Marketing & Commercial for Magic.

[6] FE 5 was Head of Marketing for Italy from February 2021 through July 2024, and reported to Director of Marketing for Europe Craig Wilkins, EVP and Chief Revenue Officer Matt Austin, and Head of Marketing Operations Katrien Van Basten Batenburg. FE 5 further received directives for marketing spending from Senior Franchise Marketing Director for Europe Helene Kurz. In this role, FE 5 was responsible for managing the Company's marketing budget for Italy, regularly attended meetings with Chief Revenue Officer Matt Austin and managers of other local markets, and communicated regularly with current and former Wizards personnel, including via Whatsapp. Prior to his tenure as Head of Marketing for Italy, FE 5 served as a Wizards Brand & Community Manager from March 2013 through February 2015, and later as Hasbro Digital Manager for Italy from December 2016 through June 2018, and Head of Media & eCommerce from July 2018 through January 2021.

later relayed to FE 1, Defendant Cocks told Defendant Williams that the pricing variability and elasticity of Magic sets could be used to address revenue shortfalls elsewhere in the business. FE 1 confirmed that he later heard Defendant Cocks reiterate this statement to Defendant Williams firsthand.

94.    FE 3 confirmed Defendant Cocks' close involvement in Wizards as CEO. FE 3 stated that Defendant Cocks continued to effectively run Wizards after he was appointed CEO in February 2022, even as Defendant Williams was the division's President. FE 3 explained that it was sometimes hard to get ahold of Defendant Cocks because he spent so much time at Wizards headquarters in Seattle, and stated that, as CEO, Defendant Cocks spent the vast majority of his time on Wizards. In line with his outsized focus on Wizards, FE 3 stated, Defendant Cocks shrunk the Consumer Products team and investments in favor of pushing Magic once he took over as CEO.

95.    As FE 3 explained, Defendant Cocks was intimately involved in Wizards, directing or approving every strategy or plan of execution before Defendant Williams formally reported plans to the rest of Hasbro's senior management. In fact, FE 3 stated, when Defendant Williams came to the Hasbro headquarters for quarterly business review meetings, Defendant Cocks would have prepared the content of her presentation on Wizards and had it ready for her. Defendant Cocks would then give much of the presentation, which covered Wizards' prior quarter and upcoming plans, on Defendant Williams' behalf.

96.    FE 1 stated that after Defendant Williams began her tenure as Wizards President, Defendant Williams became very concerned about the fact that Hasbro was overproducing Magic sets, and the fact that the Magic studio's creators were working 24/7 as a factory to generate cash for Hasbro. When FE 1 and Defendant Williams were working on long-range planning for

Hasbro's Board of Directors' end-of-year meeting in 2022, Defendant Williams expressed concern about the challenges in always delivering on revenue and on time for "parachute" drop-ins that were meant to force the generation of additional revenue beyond established plans.

97.    Defendants knew that their practice of printing Magic sets to generate short-term revenue damaged the Magic brand and Magic sales over the long term. FE 1 stated that Defendant Williams worried about the risks to buyer demand amid the ever-increasing glut of Magic releases, some of which—like Baldur's Gate—suffered weaker than expected sales. Even before the Baldur's Gate release, FE 1 said, there were clear indications that the market was saturated with the Masters sets the Company had been parachuting in for years.

98.    By the time Baldur's Gate was released in June 2022, Magic buyers who had shelled out increasing amounts of money over the years to buy the ever-expanding set of Magic offerings were unsure whether they would be able to continue buying at this pace. FE 2, who interfaced extensively with Magic buyers—both hobby shops and end consumers—during his tenure at the Company, recalled consistent complaints from buyers that Wizards was putting out too much Magic product, which would make it hard for them to continue buying.

99.    FE 2 consistently relayed these concerns (including via an internal feedback reporting software) to his supervisors, Magic Communications Director Blake Rasmussen and Marketing Director Bryan Nisperos, who reported to and met frequently with Defendant Williams. Rasmussen and Nisperos told FE 2 that they relayed his buyer reports directly to Defendant Williams. FE 2 also personally told Defendant Williams about these concerns about future Magic demand at a town hall meeting of Wizards staff. FE 2 stated that though Rasmussen, Nisperos and Defendant Williams all acknowledged the feedback from Magic buyers that FE 2 and other

community managers communicated, he was told *not* to publicly acknowledge the buyers' concerns.

100.    Defendant Williams also privately held these same concerns about the future of Magic sales. FE 1 explained that Defendant Williams was specifically concerned that Magic distributors, laden with excess inventory of Baldur's Gate and other Magic sets, would not have sufficient cash flow to purchase new Magic sets. In the second half of 2022, Defendant Williams therefore instructed FE 1 to look into granting a line of credit to distributors whose inventory did not sell through so that they could still buy the next line of Magic releases. FE 1 specifically recalled that Defendant Williams shared her concerns about distributors not being able to buy the next sets after Baldur's Gate with members of the Magic leadership team and commercial teams, including Paul Bazakas, Brian Rose, Brian Trunk and Ken Troop.

101.    By mid-2022, disappointing sales for recent Magic sets underscored to Hasbro leadership the validity of Defendant Williams' concerns about the parachute strategy's damage to Magic demand. FE 4, who served as a Senior Director of Marketing at Wizards from May of 2022 to June 2024, confirmed that in the latter half of 2022 and into 2023, Defendants knew about and consistently discussed concerns regarding Magic set overprinting, weak Magic sales that missed Hasbro's forecasts, and the risk of diluting the scarcity of Magic products resold on the secondary market. These discussions, FE 4 stated, took place in weekly executive leadership team meetings he attended alongside Defendant Williams, Defendant Cocks, and other Company executives, including Hasbro's CFO.

102.    FE 4 explained that these executive leadership team meetings featured updates on planned product launches as well as debriefs after the products had been launched. Specifically, FE 4 stated, planned Magic sets and sets that had been released were discussed in detail in these

34

meetings. During these discussions, Defendants were presented with various metrics showing how actual sales of Magic sets were trending against Hasbro's sales and demand forecasts. FE 4 added that nobody in these meetings disagreed with the conclusion that Magic sales were suffering, as the sales numbers presented in the meetings spoke for themselves.

103.    FE 4 specifically stated that meeting participants, including Defendants, discussed the fact that the evident decline in Magic demand was a function of Hasbro's overprinting of Magic sets. Presented with this idea, FE 4 said, Defendants asked follow-up questions, and directed Wizards staff to try to sell the unsold sets by introducing different marketing schemes and consumer outreach programs.

104.    Confronted with these concerns in the executive leadership team meetings, FE 4 explained, Defendants further instructed Wizards personnel to reevaluate the "economy" for printing Magic sets. FE 4 stated that Hasbro evaluated the secondary market for Magic cards, as it helped the Company understand how the fan community viewed the economy for cards. The secondary market was discussed in executive leadership meetings FE 4 attended.

105.    FE 1 recalled that after the November 14, 2022 release of the BofA Report concluding that Hasbro was "overprinting" Magic sets, there was recognition within the Company that *management had gotten "caught."* At the staff level, FE 1 said, everyone knew Bank of America had their number, and Hasbro employees from the line staff up to the director level commented that *Bank of America got it right with their report*.

106.    FE 5 was familiar with the BofA Report when it was published and confirmed that Wizards personnel agreed with its conclusions. When the BofA Report was released, FE 5 recalled, he discussed it in a Whatsapp group chat with other former and then-current Wizards employees, including Retail Experience Specialist Andrea Vitali, Senior Commercial Director Davide Bonati,

and Key Account Manager Frank Hanford—who all agreed that the report was accurate. FE 5 recalled that the group's members agreed that the "overprinting" described by the report was something they all knew about—and moreover that they were glad the report had been released, hoping it would serve as a "reality check" for Hasbro regarding the Company's use of Magic as a cash cow to compensate for revenue shortfalls in other divisions.

107.    FE 4 similarly confirmed that the BofA Report was discussed within Hasbro after it was released, and that Company leadership acknowledged that Hasbro's overprinting of Magic sets was diluting the franchise. FE 3 added that after the BofA Report's release, he attended a quarterly business review meeting at which Hasbro executives including Defendant Cocks discussed the report. At that meeting, FE 3 explained, Hasbro executives expressed fear as to whether the report was true, and the Company's communications personnel, including the Investor Relations team, scrambled to find a response and some way to "fix" the issue. As FE 1 recalled, the policy that came from Defendant Cocks and the communications team was to "*deny, deny, deny*." These denials, of course, were false.

### 2.    Unknown to Investors, Hasbro Prematurely Stopped the Sale of the Magic 30th Set to Hide Poor Sales, *Not* Because the Set Was "Out of Stock"

108.    Defendant Williams' fears about a drop-off in Magic consumer demand due to the market impact of overprinted Magic sets continued to come to fruition when Hasbro released the Magic 30th Set on November 28, 2022. Although Hasbro publicly stated that the set was "out of stock" shortly after the sale commenced, this was *not* true. FE 1, who was in the Magic 30th Set "war room" on November 28, explained that sales for the set were stopped in a matter of minutes after the release went live because it was immediately evident that sales were weaker than expected—*not* because the set was out of stock.

36

109.    FE 1 explained that personnel at Wizards, including Defendant Williams, had developed a plan prior to the release date for the Magic 30th Set that called for sales to be cut off and an "out of stock" message to be posted on the sale website in case sales velocities were "underwhelming" after the release went live. Per that predetermined plan, FE 1 recalled, Defendant Williams was in constant contact with the war room for the duration of the foreshortened sale, and Ken Troop had the authority to decide to stop sales.

110.    FE 1 stated that Defendant Cocks knew there was a plan to prematurely cut off sales of the Magic 30th Set due to poor sales velocities before the plan was implemented. FE 3 agreed, stating that Defendant Cocks would have known about the plan—or, indeed, devised it himself— because he was so deeply involved in planning and executing strategy for Wizards and Magic.

111.    FE 1 stated that when the Magic 30th Set was released at 9:00am Pacific time on November 28, the Wizards personnel in the war room, including FE 1 and Ken Troop, immediately saw that sales velocities were weak. When Troop decided to stop the sale and put up the "out of stock" message, FE 1 said that decision was immediately relayed to Defendant Williams, and Defendant Williams responded with a thumbs-up, approving the decision. FE 1 also stated that, per ordinary Company practice, Defendant Cocks would have been told about the results and premature closing of the sale soon after it happened by either Defendant Williams or Ken Troop.

112.    Other Wizards employees were aware that the Magic 30th Set was **_not_** "out of stock" despite the Company's public representations to the contrary. FE 6, who served during the Class Period as a Wizards Play Network liaison between the Company and hundreds of hobby shops across fourteen U.S. states, confirmed that the Company stopped sales of the Magic 30th Set in under an hour, having sold only a portion of its available inventory, because the set was not

selling well—***not*** because it was out of stock.[7] In fact, soon after the set's release, FE 6 and other Wizards employees saw photos of Magic 30th Sets in a Texas landfill, alongside much older Magic product. FE 6 said that it would not make sense for any Magic 30th Sets to end up in a landfill if the set had indeed sold out.

113.    FE 4 confirmed that poor sales and revenue for the Company's Magic 30th Anniversary products were discussed in executive leadership team meetings—in particular, these discussions after the set's release centered on the fact that sales had not met Hasbro's projections. FE 4 stated that those projections themselves, and planning for the Magic 30th Set, had also been discussed in meetings prior to the set's release. Further corroborating the poor sales of the Magic 30th Set, FE 2 recalled that the Company gave each Wizards employee Magic 30th Set packs for Christmas in 2022. FE 2 stated that when, in response, some Wizards employees mentioned to their managers the Company's statement that the set had sold out, they were met with shrugs and raised eyebrows.

## V.    THE TRUTH IS GRADUALLY REVEALED AS DEFENDANTS CONTINUE TO MATERIALLY MISLEAD THE MARKET

### A.    The Truth Begins to Emerge, But Defendants Continue to Mislead Investors

114.    As noted above, on the morning of November 14, 2022, Bank of America issued its report that Hasbro had been "overprinting" Magic sets, generating short-term income but risking damage to the value of the Magic brand. *See supra* ¶¶49-56. On this news, Hasbro's stock price fell by nearly ***10%***, wiping out approximately ***$875 million*** in shareholder value.

---

[7] FE 6 was a Wizards Play Network Specialist from January 2022 through March 2025. In this role, he served as liaison between the Company and hundreds of hobby shops across fourteen U.S. states, attended monthly sales meetings, and attended weekly Magic meetings that were led by Magic VP Ken Troop and featured postmortem analysis after each new product release.

115.    Commentators immediately attributed the 10% drop in Hasbro's stock price on that day to the BofA Report. On the day of the report's publication, for example, IGN published an article titled "***Hasbro Stock Down After Analysts Criticize Handling of Magic: The Gathering.***"

116.    In the wake of the BofA Report, however, Defendants denied that Hasbro had produced Magic sets for any reason other than its purported "segmentation" strategy. *See supra* ¶¶60-68. Defendants first comforted investors by announcing that the Magic 30th Set released on November 28, 2022, had sold "out of stock" in just over half an hour. Then, when asked directly about the BofA Report's conclusions on a December 8, 2022 investor call, Defendant Williams told investors that "***there is no evidence that MAGIC is overprinted***," and asserted, "***[W]e print and reprint products to meet demand from our players***." Analysts and the press credited Defendants' denials and reassurances. *See supra* ¶¶69-71.

117.    But these denials and reassurances were false and, at minimum, highly misleading. As FE 1 confirmed, Hasbro had long employed its "parachute" strategy—overprinting Magic sets to make up for poor performance elsewhere in the Company—and did ***not*** change this strategy after the BofA Report was released. Further, multiple former employees confirmed, and Defendants later admitted, that the Magic 30th Set had not in fact sold "out of stock"—Hasbro had instead prematurely cut off sales when it became apparent that the set was not selling well. *See supra* ¶¶108-13; *infra* ¶¶129-31.

**B.    The Truth Continues to Emerge When Hasbro Announces Worse-Than-Expected Wizards Revenue**

118.    The truth about Hasbro's overproduction of Magic sets—and the poor sales of the Magic 30th Set—was further revealed when Hasbro announced that Wizards' revenue for the fiscal fourth quarter of 2022 had substantially missed the Company's guidance and analysts' expectations.

39

119.    After market close on January 26, 2023, Hasbro issued a press release previewing its financial results for the fiscal fourth quarter and full year of 2022. The release announced that Wizards' year-over-year fourth quarter revenue growth had substantially missed Hasbro's guidance and analysts' expectations by double-digits percentages. Wizards' growth for the full fiscal year 2022 was thus also lower than analysts had forecasted.

120.    Quoting Defendant Cocks, the press release also stated that Hasbro's Consumer Products division had "underperformed" in the fourth quarter—an underperformance exposed by Wizards' failure to generate enough compensatory revenue under Defendants' "parachute" plan. The release also disclosed that Hasbro would "eliminat[e] . . . approximately 15% of its global workforce" in the coming year, and announced the departure of the Company's COO, who had overseen the Consumer Products division.

121.    The poorer-than-expected Wizards results announced in the January 26 release—on the heels of what BMO analysts called "one of the biggest [Magic] release quarters in history"—confirmed that, as the BofA Report had indicated, Hasbro was "overprinting" Magic sets ***not*** pursuant to the Company's purported print-to-demand segmentation strategy, but instead to generate short-term revenue to cover for shortfalls elsewhere in the Company.

122.    Reiterating their November thesis, Bank of America analysts wrote in a January 27, 2023 report that they "[r]emain[ed] cautious on the Magic business" and "HAS's fundamental growth drivers," reiterating their "Underperform" rating for the Company and stressing their "***concern[] that the company has been overproducing Magic: The Gathering in a worsening economic backdrop, which could damage the long-term value of the brand***."

123.    In an article published following Hasbro's full earnings announcement, the New York Times cited the BofA Report to explain Wizards' worse-than-expected results, adding that

"Hasbro faces challenges making Magic even bigger, particularly player fatigue brought on by the release of 39 new card sets last year, up from 15 in 2019, according to an analysis by Bank of America." A Global Toy News article published a day later similarly emphasized Bank of America's continued drumbeat about Magic's overprinting in light of Wizards' disappointing results, reiterating that Wizards and Magic "are the tail that wags the Hasbro dog."

124.    A January 26, 2023 UBS report drew explicit connections between the performance of Wizards and that of Consumer Products—the very same connection that had long been recognized within the Company in the implementation of the "parachute" strategy. As the UBS analysts made clear, the quarter's Wizards results, which came "*amid significant concerns over M[agic] growth*," were all the more important in light of poor Consumer Products earnings: "*[I]f the investment thesis for Hasbro was heavily dependent on where Wizard business is headed, today's results highlight that dependence even further*." Analysts from Truist, in a report published on January 26, 2023 and subtitled "*Little Magic to Speak Of*," echoed these concerns, writing that "*the shortfall in Hasbro's key growth business"—i.e., disappointing Wizards earnings—"will stimulate greater concerns around Hasbro's ability to grow in [20]23.*"

125.    In a report published the same day, D.A. Davidson analysts quantified the Wizards shortfall, writing that despite Wizards' 22% year-over-year fourth quarter revenue increase, Wizards had underperformed the "astronomical [40%] Y/Y growth in 4Q22" that Defendants had "stuck to their script" in consistently projecting. Wizards' fourth quarter revenue growth of 22% had even underperformed D.A. Davidson's much more conservative 25% estimate—and all against the backdrop of a Consumer Products shortfall of "surprising" magnitude. Alarmed, the D.A. Davidson report concluded that these results "*raise[] questions about what is going on*

*internally in the company that causes them to issue projections that seem too optimistic to outsiders and end up being so way off*."

126.    Similarly, BMO Capital Markets analysts—just weeks after writing that Magic could be "saturated" and was facing a "softening adult collector market"—published a January 26, 2023 report titled "***Tragic the Gathering***," pointing out that Wizards' reported 22% fourth quarter year-over-year revenue growth had substantially missed their 36% growth forecast. Goldman Sachs analysts, in their own January 26, 2023 report, similarly noted that "***W[izards] revenue missed***" their expectations—which had been even higher than BMO's—and that "***investor concerns around the outlook for Magic The Gathering have been a key area of focus***." Accordingly, the report asked, "***Is the outlook for a doubling of Wizards of the Coast revenue by 2027 still intact?***"

127.    In the days after the January 26 disclosure, analysts continued to express concern over the lower-than-expected Wizards results—and maintained their focus on the impact of uncertainties about Magic's growth stemming from the now-evident overprinting and its impacts. In a January 30, 2023 report titled "***Hasbro and the Terrible, Horrible, No Good, Very Bad Quarter***," Pacific Square Research analysts framed the quarter's poor Wizards results, which "missed guidance by 11.7%," with reference to Magic overproduction: "***[Hasbro] has pitched investors on the long run growth and profitability of the Wizards segment. But 2022 has proven to be a disappointment***. We've recently noted the ***excessive number of new card issuances***[ and] the ***less than successful 30th anniversary card drop***."

128.    Investors were harmed by Defendants' misrepresentations about the overprinting of Magic sets to generate near-term revenues at the expense of the franchise's future. Following

the January 26, 2023 revelation, the price of Hasbro's common stock fell by over **8%**, wiping out over **$700 million** in shareholder value.

129.    Defendants soon admitted that the Magic 30th Set had **not** in fact gone "out of stock" a mere half-hour after its release, contrary to their representations at the time and afterward. Specifically, on Hasbro's February 16, 2023 earnings call for the fiscal fourth quarter and full year of 2022, Defendant Cocks called the Magic 30th Set a "challenge[]" to Wizards' growth and admitted that it adversely "impact[ed] Q4 results."

130.    On the same call, Defendant Cocks admitted that percolating concerns about Magic set overprinting would require Hasbro to change course. Fielding an analyst's question about whether the Company expected Magic to grow in 2023, Defendant Cocks responded, "**[Magic] growth will be a bit moderated versus what we saw in prior years. We're taking some of the feedback to heart**."

131.    Analysts quickly reacted, reporting on the quantifiable impact of the poor sales of the Magic 30th Set that Defendants had hidden, as well as the evident weakness in the Company's growth strategy for Wizards. In a report released the same day, for example, J.P. Morgan analysts highlighted that the "**[Magic 30th Set] Drove [the] 4Q Wizards Miss**," and reported that the Company had "cited a **~10 point impact to 4Q growth in the Wizards segment from the miss-pricing [sic] of [the Magic 30th Set]**." In their February 16 report, Goldman Sachs analysts maintained their "Neutral" rating on Hasbro, citing their "**conservatism around the company's ability to execute against scaling the Wizards [] strategy**."

132.    True to Defendant Cocks' admission, Magic growth was indeed moderated through 2023, as Hasbro adjusted to the revelation of the harm to Magic caused by the Company's "parachute" set overprinting strategy. After years of massive growth in the number of Magic box

sets the Company released—from eight in 2019 to twenty-six in 2022—Hasbro pulled back, ***decreasing*** Magic box set releases to a relatively modest twenty-four in 2023.

133.    Further, Wizards soon cut back on the number of Secret Lair sets it would sell, switching from the print-to-demand model it had used from 2020 through 2023 to a limited print run for each set. This announcement came in January 2024, which was exactly one year—or, per FE 1, roughly how long it took the Company to make its condensed-timeline parachute sets—after the truth about Hasbro's overproduction of Magic sets was revealed. Whereas prior to January 2024 the Company overprinted Secret Lair sets to generate short-term sales, it would now sell far fewer sets in each release—which would, of course, mitigate the devaluation of the reprinted cards on the secondary market.

134.    After the market learned that Hasbro had overprinted Magic sets and thereby harmed the Magic franchise and Magic set sales, investors turned their focus to Wizards' stubbornly elevated inventory levels. On April 27, 2023, Hasbro held its earnings call for the fiscal first quarter of 2023. On that call, Defendant Cocks addressed the Company's persistently elevated Wizards' inventories, assuring investors that, while "[o]ur owned inventory is up a bit," most of that was due to "***the nature of Wizards production***." Specifically, Defendants assured investors that the "higher Wizards of the Coast inventories" were due to "***the timing of [Magic] releases this year***," including a release in "mid-April" and another "shortly before the start of Q3"—i.e., ***not*** due to past overprinting of Magic sets.

135.    Defendants continued to reassure investors that Wizards inventories were elevated because of the production of Magic sets that would be sold in future releases, ***not*** because the Company still owned unsold Magic sets left over from past releases. On May 3, 2023, Hasbro filed its Form 10-Q for the fiscal first quarter of 2023 with the SEC. The Form 10-Q, which was signed

by Defendant Cocks, stated that "[t]he increase in [Hasbro's inventories] during the first quarter of 2023 was driven primarily by higher inventory balances within the Wizards of the Coast and Digital Gaming segment, ***most notably in anticipation of several upcoming MAGIC: THE GATHERING set releases***."

136.    Analysts credited Defendants' explanations that the elevated Wizards inventories were due to upcoming Magic set releases, and ***not*** unsold past Magic sets. For example, BMO analysts wrote in an April 28, 2023 report that Hasbro's "owned inventory was up +11% at the end of the quarter ***due to [the] Magic the Gathering release schedule***." A Roth MKM report published the same day similarly stated that elevated inventories were "***due to the timing of 2Q Magic: The Gathering set releases***." In another report published on June 14, 2023, Roth MKM analysts likewise reiterated that the increase in "owned inventories was ***a reflection of timing associated with product launches for Magic: The Gathering***."

137.    However, Defendants' reassurances were false and misleading. In truth, and unknown to investors during the Class Period, this elevated Wizards inventory was due to Magic sets from past releases that had gone unsold because of Hasbro's unsustainable overprinting of "parachute" sets. As FE 4 explained, disappointing Magic sales during 2022 consistently missed internal Company forecasts. *See supra* ¶¶101-04. These disappointing sales—***not*** "the nature of Wizards production" or "the timing of [Magic] releases" in 2023—left Hasbro with a glut of old Magic sets. For example, as former employees explained, the Baldur's Gate parachute set released in mid-2022 did not sell out, and Hasbro still had leftover unsold inventory of the Magic 30th Set after Defendants falsely represented that the set was out of stock in November 2022. *See supra* ¶¶97, 112. Indeed, elevated Wizards inventories were so stuffed with old, obsolete Magic sets that

45

the Company was ultimately forced to bear *"high[] inventory obsolescence charges,"* which cut into Wizards' 2023 operating profit. *See infra* ¶139.

C.    **The Truth Fully Emerges When Hasbro Reveals Higher-Than-Expected Wizards Inventory Levels**

138.    The truth about the obsolete unsold Magic sets in Wizards' elevated inventories—and thus the full truth about the extent of the damage to the Magic brand from Hasbro's parachute strategy of overprinting Magic sets—was finally revealed on October 26, 2023. Before the market opened that day, Hasbro released its earnings report for the fiscal third quarter of 2023, which revealed that Wizards inventories remained more stubbornly elevated than inventories elsewhere in the Company. Specifically, Hasbro stated that they had "[r]educed owned inventory [by] 27%" companywide, but that Consumer Products inventories decreased by 34%. As FE 5 confirmed, Wizards was the only other Hasbro division that carried inventory; thus, by mathematical necessity, *Wizards inventory had improved less than the Company's inventories as a whole*. On the Company's earnings call later that day, Hasbro reiterated that the "reduc[tion in] total owned inventory" was "*primarily driven by [the] reduction in [non-Wizards] inventory*," and cut its guidance for the year, announcing a $50 million "onetime cost" to "move through inventory," including "extra marketing" and "extra obsolescence cost[s]."

139.    This disclosure—that Wizards inventories remained so persistently high nearly ten months into 2023, even relative to inventories elsewhere in the Company, and even as Hasbro touted "solid performance on Magic"—belied Defendants' earlier statements that high Wizards inventories were due to production of upcoming Magic set releases, including in approximately the fiscal second and third quarters of the year. The October 26 disclosure thus made clear that, contrary to Defendants' statements, Wizards inventories indeed contained old, unsold Magic sets left over from past releases—as Hasbro ultimately admitted when it revealed that *the decrease in*

46

*Wizards operating profit in 2023 was "driven primarily" by "high[] inventory obsolescence charges*."

140.    Analysts reacted swiftly and severely to this news. In a report published on October 27, 2023, for example, Roth MKM analysts repeated the Company's disclosure that "owned inventory . . . is down 27% y/y, including a 34% reduction for Consumer Products," and accordingly slashed their expectations for Wizards growth by *more than half*, from 16.5% to 7%.

141.    Investors were harmed by Defendants' misrepresentations about the nature and extent of Hasbro's Magic inventory. Following the October 26, 2023 revelation, the price of Hasbro's common stock fell by over *16.3%*, wiping out over *$1.2 billion* in shareholder value. Through the November 14, 2022, January 26, 2023, and October 26, 2023 disclosures described herein, Hasbro's stock price fell by more than *34%*, erasing over *$2.7 billion* of shareholder value.

## VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

142.    As described herein, Defendants made materially false and misleading statements and omissions on several dates throughout the Class Period.

### A.    September 16, 2021 – Investor Call

143.    On September 16, 2021, Stifel, Nicolaus and Company held a call focused on Wizards of the Coast and featuring Defendant Cocks, who at the time was President of Wizards.

144.    On the call, the moderator asked Defendant Cocks about "the *key drivers . . . behind [Magic] performance* over the last couple of years." In response, Defendant Cocks told investors, "*We've been driving our growth to date on kind of a play-based segmentation*," explained that the "segmentation" strategy consisted of marketing products to "*four segments*," i.e., competitive players, arena players, social players and collectors, and reiterated that this strategy "*ha[d] really driven MAGIC's growth, and we see continuing to drive MAGIC's growth moving forward.*"

47

145.    Defendant Cocks' statements highlighted in ¶144 above were materially false and misleading when made. It was false and, at minimum, misleading for Defendant Cocks to state that the Company's purported print-to-demand "segmentation" strategy drove Magic's growth, while omitting that, in truth—as former Hasbro employees have explained—Hasbro drove Magic's growth by unsustainably overprinting "parachute" sets to generate short-term revenue to make up for shortfalls in its Consumer Products business and elsewhere in the Company. *See supra* ¶¶76-107.

146.    The moderator also asked Defendant Cocks, "Should we expect a more regular cadence of [Magic] card releases going forward?" In response, Defendant Cocks first emphasized "***thinking about the customers and what they want***," and then explained that Magic was "***not trying to build one product for one customer that has to buy everything***," because "***the real growth and the real driver for us has been thinking about things on a segmented basis***."

147.    Defendant Cocks' statements highlighted in ¶146 above were materially false and misleading when made. It was false and, at minimum, misleading for Defendant Cocks to assert that the cadence of Magic releases was due to "thinking about . . . what [customers] want" and "thinking about things on a segmented basis," when in truth—as former Hasbro employees have explained—the cadence and schedule of Magic releases was determined by Hasbro's strategy of compensating for poor anticipated results elsewhere in the Company by overprinting and releasing parachute sets in specific quarters. *See supra* ¶¶76-107.

148.    Citing examples of products released as part of the segmentation strategy, Defendant Cocks further stated during the investor conference that "***we've done new things like our Secret Lair card drops . . . for th[e collector] segment***."

149.    Defendant Cocks' statement highlighted in ¶148 above was materially false and misleading when made. It was false and, at minimum, misleading for Defendant Cocks to state that "Secret Lair card drops" had been printed "for t[he collector] segment," when in truth, as former Hasbro employees have explained, Secret Lair sets were simply a standardized line of parachute sets, full of reprinted cards, that Hasbro created to generate short-term revenue to make up for shortfalls elsewhere in the Company. *See supra* ¶¶83-85. As such, these sets in fact diluted card values on the secondary market that Magic collectors participated in. *See, e.g.*, *supra* ¶92.

**B.    November 11, 2021 – Jefferies Global Interactive Entertainment Conference**

150.    On November 11, 2021, Defendant Cocks appeared at the Jefferies Global Interactive Entertainment Conference. Asked to "talk a little bit about how the [Hasbro Brand] Blueprint allows [Magic] to experience that explosive growth," Defendant Cocks responded, "***We drove all new segmentation for how we think about our product lines***."

151.    Defendant Cocks' statement highlighted in ¶150 above was materially false and misleading when made. It was false and, at minimum, misleading for Defendant Cocks to state that the driver of Magic's "explosive" growth was "segmentation," while omitting that, in truth— as former Hasbro employees have explained—Magic's growth was driven by Hasbro's unsustainable practice of printing "parachute" sets to generate short-term revenue to make up for shortfalls elsewhere in the Company. *See supra* ¶¶76-107.

**C.    October 18, 2022 – Q3 2022 Earnings Call**

152.    On October 18, 2022, the Company held its earnings call for the fiscal third quarter of 2022. On that call, Defendant Williams addressed the following question from a securities analyst about investor concern regarding Magic: "There's been some investor concern that there's maybe been too many MAGIC releases in a short time frame. There's some talk of wallet fatigue among the players out there. We've seen the secondary market prices come down a bit. So, I'm

curious just what's your response to that concern that there's just a lot of MAGIC product coming all at once?" Defendant Williams responded, "*[Y]ou've got the same number of sets happening in a year in the hobby channel*."

153.    Defendant Williams' statement highlighted in ¶152 above was materially false and misleading when made. It was false and, at minimum, misleading for Defendant Williams to represent that the number of Magic sets printed annually was sustainable by describing the set release cadence as "the same number of sets happening in a year," while omitting that, in truth— as former Hasbro employees have explained—the increasing total number of annual Magic set releases, and Magic's growth, was driven by Hasbro's unsustainable practice of printing "parachute" sets to generate short-term revenue to make up for shortfalls elsewhere in the Company. *See supra* ¶¶76-107.

### D.    November 28, 2022 – Release of the Magic 30th Set

154.    On November 28, 2022, Hasbro released the pivotal Magic 30th Set in an online sale beginning at 9:00am Pacific time. Within roughly half an hour of the release, Defendants posted a message on the release website that the Magic 30th Set was "*out of stock*."

155.    Defendants' statement highlighted in ¶154 above was materially false and misleading when made. It was false and, at minimum, misleading for Defendants to state that the Magic 30th Set was "out of stock" because, when that message was posted, the Magic 30th Set was ***not*** "out of stock." As former Hasbro employees have explained, Defendants prematurely cut off sales of the Magic 30th Set pursuant to a predetermined plan soon after its release because initial sales velocities indicated that the set was not selling well, and stock of the Magic 30th Set was thus left over when Defendants posted the false "out of stock" message on the release website. *See supra* ¶¶108-113.

E.      **December 8, 2022 – Hasbro Special Call**

156.    On December 8, 2022, Defendant Cocks and Defendant Williams addressed investors' concerns over the BofA Report and questions about the Magic 30th Set release in a special investor call that was explicitly "focus[ed]" on Magic "and Hasbro's long-term strategy for its gaming business."

157.    On that call, a UBS analyst asked Defendant Williams, "[I]f it isn't price, are you releasing then more product this year? Could you sort of go through pillars of growth for Magic?" Defendant Williams responded: "***Our growth is coming from both our customer and product segmentation strategy*** . . . [a]nd as a result, we're serving more player segments [than ]ever before, ***and so th[at]'s going to shift [] how many SKUs we released in a year***." Defendant Williams further stated: "***Our growth has come from monetizing more player segments and not just from increasing the spend of the same core set of players, and our product release schedule really reflects that***." On the same call, Defendant Cocks touted segmentation as the reason the Company had "***either tripled or come close to triple the overall Magic business***" over the prior approximately six years, and stated: "***[W]hen we look at how we think about growing Magic over time . . . it's about leaning into our segmentation strategy***."

158.    Defendant Cocks' and Defendant Williams' statements highlighted in ¶157 above were materially false and misleading when made. It was false and, at minimum, misleading for Defendant Cocks and Defendant Williams to attribute Magic "growth" and success, the "shift in how many [Magic] SKUs we[re] released in a year," and the Magic "product release schedule" to the Company's purported segmentation strategy. In truth, as former Hasbro employees have explained, Magic's growth and success, the increasing number of Magic SKUs, and the Magic set release schedule were all driven by Hasbro's unsustainable overprinting of "parachute" sets—

51

including at least 18 of the 39 sets released in 2022—to make up for revenue shortfalls elsewhere in the Company. *See supra* ¶¶76-107.

159.    On the special call, Defendant Williams was then asked to "answer" the "claim that you're printing too many cards," and responded that "***there is no evidence that Magic is overprinted***." The UBS analyst then noted that "[t]here has been some chatter . . . that [secondary market card] values are coming down because you're printing too much," and asked, "Is that something that you keep track of? Is that something that concerns you?" In response, Defendant Williams stated flatly: "***[W]e print and reprint products to meet demand from our players***." Defendant Williams also stated that Wizards had "expanded the number of booster product types" and "smaller print run products" released during the year in order "***to meet player preferences***."

160.    Defendant Williams' statements highlighted in ¶159 above were materially false and misleading when made. It was false and, at minimum, misleading for Defendant Williams to state that there was "no evidence that Magic is overprinted," that Hasbro "print[s] and reprint[s] products to meet demand from [its] players," and that the Company had printed more Magic sets "to meet player preferences." In truth, as former Hasbro employees have explained, Hasbro overprinted "parachute" Magic sets—including at least 18 of the 39 sets released in 2022—not to meet demand from player segments under the purported "segmentation" strategy, but instead to make up for revenue shortfalls elsewhere in the Company at the risk of long-term harm to the Magic brand. *See supra* ¶¶76-107. As former Hasbro employees further explained, there was in fact "evidence that Magic [wa]s overprinted" by the time Defendant Williams made these statements, including that demand for Magic was waning and Magic set sales were consistently missing Hasbro's internal forecasts. *See supra* ¶¶97-104.

161.    On the same call, Defendant Williams also assuaged investors' worries about the success of the Magic 30th Set, stating, "[S]ometimes we step back and look[] to customer feedback like we did on our recent 30th anniversary edition, where *we scaled back the expected supply to ensure a great collector experience*."

162.    Defendant Williams' statement highlighted in ¶161 above was materially false and misleading when made. It was false and, at minimum, misleading for Defendant Williams to assure investors that Hasbro had "scaled back the expected supply" of the Magic 30th Set well in advance of the sale "to ensure a great collector experience" in response to player feedback. In truth, as former Hasbro employees have explained, Defendants prematurely cut off sales of the Magic 30th Set to cover up the fact that the set would sell poorly, which had been made apparent by slow sales velocities immediately after its release. *See supra* ¶¶108-113. As multiple knowledgeable former employees inside Wizards further confirmed, unsold inventory of the Magic 30th Set was thus left over when Defendants issued the "out of stock" message on the Company's website. *See supra* ¶113.

**F.    April 27, 2023 – Q1 2023 Earnings Call**

163.    On April 27, 2023, Hasbro held its earnings call for the fiscal first quarter of 2023. On that call, Defendant Cocks addressed the Company's persistently elevated inventory levels, stating, "*Our owned inventory is up a bit, but most of that has to do with kind of the nature of Wizards production*." The Company's CFO added that *"higher Wizards of the Coast inventories"* were due to *"the timing of [Magic] releases this year,"* including the "March of the Machines release [in] mid-April" and "Universes Beyond: The Lord of the Rings, Tales of the Middle-Earth shortly before the start of Q3."[8]

---

[8] Former employees confirmed that Hasbro's then-CFO, Deborah Thomas, attended regular executive-level meetings with Defendants Cocks and Williams during the Class Period. In these

164.    Defendants' statements highlighted in ¶163 above were materially false and misleading when made. It was false and, at minimum, misleading for Defendants to attribute Hasbro's elevated owned inventory level to "the nature of Wizards production," and specifically to "the timing of [Magic] releases" later in the year. In truth, the Company's elevated Wizards inventory was due to Magic sets from past releases that had gone unsold because of Hasbro's unsustainable overprinting of "parachute" sets. Former Hasbro employees have explained that disappointing Magic sales during 2022 consistently missed internal Company forecasts. *See supra* ¶¶101-104. These disappointing sales—***not*** "the nature of Wizards production" or "the timing of [Magic] releases" in 2023—left Hasbro with a glut of old Magic sets, which ultimately caused a decrease in Wizards operating profit "driven primarily" by "high[] inventory obsolescence charges." For example, as confirmed by former Hasbro employees, the Baldur's Gate set released in mid-2022 did not sell out, and Hasbro still had leftover stock of the Magic 30th Set after Defendants falsely represented that the set was out of stock in November 2022. *See supra* ¶¶97, 113.

G.    **May 3, 2023 – Form 10-Q**

165.    On May 3, 2023, Hasbro filed its Form 10-Q for the fiscal first quarter of 2023 with the SEC. In the Form 10-Q, which was signed by Defendant Cocks, the Company stated that "[t]he increase in [Hasbro's inventories] during the first quarter of 2023 was driven primarily by ***higher inventory balances within the Wizards of the Coast and Digital Gaming segment, most notably in anticipation of several upcoming MAGIC: THE GATHERING set releases***."

---

meetings, Thomas, Defendants, and other meeting participants discussed Company's disappointing Magic set sales, and nobody in these meetings disagreed with the conclusion that Magic sales were suffering. *See supra* ¶¶101-104. These disappointing sales left Hasbro with a glut of unsold Magic sets. Thomas thus either made this statement with the knowledge that it was false and misleading or recklessly disregarded whether this statement was false and misleading.

166.    Defendants' statement highlighted in ¶165 above was materially false and misleading when made. It was false and, at minimum, misleading for Defendants to attribute Hasbro's "higher inventory balances within [Wizards]" to inventories kept "in anticipation of several upcoming [Magic] set releases," when in truth, the Company's elevated Wizards inventory was due to Magic sets from past releases that had gone unsold because of Hasbro's unsustainable overprinting of "parachute" sets. Former Hasbro employees have explained that the disappointing Magic sales during 2022 consistently missed internal Company forecasts. *See supra* ¶¶101-104. These disappointing sales—***not*** "upcoming [Magic] releases" in 2023—left Hasbro with a glut of old Magic sets, which ultimately caused a decrease in Wizards operating profit "driven primarily by "high[] inventory obsolescence charges." For example, as confirmed by former Hasbro employees, the Baldur's Gate set released in mid-2022 did not sell out, and Hasbro still had leftover stock of the Magic 30th Set after Defendants falsely represented that the set was out of stock in November 2022. *See supra* ¶¶97, 113.

## VII.    DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS WERE MATERIAL TO INVESTORS

167.    Defendants' false and misleading statements and omissions were material to investors, as demonstrated by the facts below as well as the facts discussed above.

168.    ***First***, Wizards was the Company's most important division. *See supra* ¶¶34-35. Magic was the most important brand within Wizards—and the Company's most important brand overall. *See supra* ¶36. Meanwhile, at least 46% of the Magic sets Hasbro released in 2022 were "parachute" sets printed to generate short-term revenue to make up for shortfalls elsewhere in the Company. *See supra* ¶90.

169.    ***Second***, analysts, investors, and Hasbro's executive leadership, including the Executive Defendants, were all highly focused on the performance and growth of Wizards—and

Magic in particular—which demonstrates their importance to the Company. *See supra* ¶¶37-48. Indeed, in the wake of the BofA Report, Hasbro held a special investor call with UBS specifically "focus[ed]" on Magic "and Hasbro's long-term strategy for its gaming business," during which Defendants faced questions about the BofA Report and repeatedly denied its conclusions. *See supra* ¶¶64-68.

170.    ***Third***, Defendants frequently repeated their misrepresentations and omissions during the Class Period, many times nearly verbatim, *see supra* ¶¶142-66, demonstrating that Defendants felt it was important that the market heard, took note of, and believed this information.

171.    ***Fourth***, Magic set overprinting, the failure of the Magic 30th Set, and the glut of old Magic sets in Hasbro's inventory significantly impacted the Company's financial health and stock price, demonstrating that Defendants' misstatements and omissions on those topics were material to investors. Magic's performance suffered, and Wizards significantly missed analysts' consensus expectations for its performance in the fourth quarter and full year of 2022, as a result of Hasbro's practice of overprinting Magic sets to make up for expected revenue shortfalls elsewhere in the Company in specific quarters—and the consequent failure of the Magic 30th Set. *See supra* ¶¶114-33. Because Wizards' performance was essential to the financial health of the Company as a whole amid suffering Consumer Products sales, the segment's miss also meant that the Company as a whole performed worse than analysts and investors expected. And Hasbro's overprinting of Magic sets, which remained in the Company's bloated inventory, ultimately led to a decrease in Wizards' operating profit in 2023 that was "primarily" driven by "inventory obsolescence charges." The BofA Report's November 2022 analysis of Magic overprinting, the confirmation of the BofA Report's conclusions in Hasbro's January 2023 earnings pre-release, and the Company's October 2023 revelation of obsolete Magic set inventory caused major drops in

Hasbro's stock price and the elimination of billions of dollars in shareholder value. *See infra* ¶¶208-21.

## VIII.   ADDITIONAL SCIENTER ALLEGATIONS

172.    Defendant Hasbro and each of the Executive Defendants acted with scienter in making the statements described herein, *see supra* ¶¶142-66. The ample evidence presented below, especially when considered together (as it must be), supports a strong inference that Defendants either knew that these statements were materially false and misleading when made or recklessly disregarded whether these statements were materially false and misleading when made.

173.    ***Defendant Cocks began the parachute strategy and oversaw its implementation as Wizards President.*** Defendant Cocks joined the Company as President of Wizards in June 2016. In 2018—as confirmed by FE 1, who served as Wizards Vice President and worked directly with Defendant Williams during the Class Period—Hasbro began to print certain Magic sets, which carried high margins and were a cash cow for the Company, in order to compensate for falling financial performance in other Hasbro business segments. As FE 1 explained, Wizards, under the direction of Defendant Cocks, created specific Magic SKUs (i.e., sets) that could be quickly manufactured and dropped into the market to make approximately $40 to $80 million in the event of a revenue shortfall elsewhere within the Company. Bill Rose, FE 1's Senior Vice President, called this "Project Parachute." These SKUs included Magic's Masters sets, its Commander Legends sets, and its Secret Lair sets—among others. *See supra* ¶¶79-90.

174.    FE 1 explained that the parachute strategy was supposed to be something Wizards did for Hasbro to generate short-term revenue if necessary, but that it in fact happened every year. FE 1 recalled that even before Defendant Cocks was CEO, Hasbro's former CEO would tell Defendant Cocks that, for example, Hasbro needed $80 million in additional revenue because something else within the Company had flopped. Defendant Cocks would then tell Bill Rose, or

FE 1 himself, to make new cards to "parachute" in because the parent Company had messed up again.

175.    ***After Defendant Cocks became CEO and Defendant Williams became Wizards President, they continued to implement the parachute strategy.*** After Defendant Cocks was elevated to become Hasbro's CEO in February 2022, he and Defendant Williams further standardized the parachute strategy of forcing Magic cards into the pipeline to make up for revenue shortfalls elsewhere in the Company—which Defendant Cocks had pioneered as Wizards President—as a core aspect of Hasbro's institutional approach to its Wizards and Consumer Products divisions.

176.    When Defendant Williams came on board as President of Wizards, Defendant Cocks introduced her to the parachute strategy. As Defendant Williams later relayed to FE 1, Defendant Cocks told Defendant Williams that the pricing variability and elasticity of Magic sets could be used to address revenue shortfalls elsewhere in the business. FE 1 confirmed that he later heard Defendant Cocks reiterate this statement to Defendant Williams firsthand.

177.    FE 1 reported that, as CEO, Defendant Cocks integrated the parachute strategy into the wider business plan of the Company via the ever-increasing number of releases of Secret Lair reprint sets. FE 3, who was a Senior Vice President at Hasbro during the Class Period, attended quarterly business review meetings with Defendant Cocks and other Hasbro executives. During these meetings, FE 3 saw presentations from the Wizards side of the business, including about Magic and the cadence of Magic set releases. Corroborating FE 1's statement that the parachute strategy was a standardized part of Hasbro's business, FE 3 recalled that the parachute strategy was discussed at some of these high-level meetings. FE 4, who was a Senior Director of Marketing at Wizards and attended weekly executive leadership team meetings with Defendants during the

Class Period, similarly confirmed that participants in those meetings discussed producing more SKUs in order to generate more revenue.

178.    FE 3 further confirmed Defendant Cocks' close involvement in Wizards as CEO. FE 3 explained that Defendant Cocks continued to effectively run Wizards after he was appointed CEO in February 2022, even as Defendant Williams was the division's President. FE 3 recalled that it was sometimes hard to get ahold of Defendant Cocks because he spent so much time at Wizards headquarters in Seattle, and as CEO, Defendant Cocks spent the vast majority of his time on Wizards. In line with his outsized focus on Wizards, FE 3 stated, Defendant Cocks shrunk the Consumer Products team and investments in favor of pushing Magic once he took over as CEO.

179.    As FE 3 explained, Defendant Cocks was intimately involved in Wizards, directing or approving every strategy or plan of execution before Defendant Williams formally reported plans to the rest of Hasbro's senior management. In fact, FE 3 stated, when Defendant Williams came to Hasbro headquarters for quarterly business review meetings, Defendant Cocks had prepared the content of her presentation on Wizards and had it ready for her. Defendant Cocks would then give much of the presentation, which covered Wizards' prior quarter and upcoming plans, on Defendant Williams' behalf.

180.    FE 1 recalled that Defendant Williams was very concerned about the Company's practice of overprinting Magic sets and the fact that the Magic studio's creators were working 24/7 as a factory to generate cash for Hasbro. FE 1 stated that when he and Defendant Williams were working on long-range planning for the Hasbro Board of Directors' end-of-year meeting in 2022, Defendant Williams expressed concern about the production slate and, given Wizards staffing, the challenges in always delivering on revenue and on time for these parachute sets.

181.    ***Defendants knew that the Magic 30th Set was a parachute set created to boost Hasbro's performance amid poor Consumer Products earnings.*** While Defendants touted the release of the Magic 30th Set as a celebration of the game's 30th anniversary, and an opportunity for collectors and players to purchase some of the game's most sought-after cards, they knew that the Magic 30th Set was a parachute set—i.e., that its production and release were timed to coincide with a period of poor earnings elsewhere in the Company, so that the revenue from the Magic 30th Set would compensate for that revenue shortfall.

182.    FE 1 recalled that the Magic 30th Set came about after Magic SVP Bill Rose came to the Magic studio in mid-2022 and said that Hasbro was "putting out the hat" for ideas as to how the Company could generate more revenue in the fourth quarter of 2022. The Magic studios were already stretched thin, but Mark Hagan, head of Secret Lair, came up with the idea for a 30th anniversary Magic set. FE 1 stated that he, Defendant Williams, Bill Rose, and Ken Troop were in the meeting where the Magic 30th Set was approved—and that Rose discussed the plan to use the Magic 30th Set as a parachute with Defendant Cocks.

183.    FE 1 stated that Wizards thus began work on the Magic 30th Set in the summer of 2022 in order to get the associated revenue on the books before the end of 2022, and that Magic was the only product that could make that happen. FE 1 recalled that Defendant Williams was concerned that the Magic 30th Set could backfire and suffer from poor sales because the parachute set comprised non-playable cards that had no actual value but were being sold for $1,000.

184.    ***Defendants knew that the "parachute" strategy of overprinting Magic sets harmed the Magic brand and sales, leaving Hasbro with obsolete Magic inventory.*** Defendants knew that by overprinting Magic sets, Hasbro ran the risk of harm to the Magic brand and Magic sales—and that these harms had in fact materialized. Defendants also knew that these harms had

resulted in a buildup of unsold past Magic sets in Wizards' inventories. FE 1 confirmed that Defendant Williams was indeed worried about risks to buyer demand amid the ever-increasing glut of Magic releases, some of which—like Baldur's Gate—suffered weaker than expected sales. Even before the Baldur's Gate release, FE 1 said, there were clear indications that the market was saturated with the Masters sets the Company had been parachuting in for years.

185.    FE 5, who served as Head of Marketing for Italy during the Class Period, further corroborated that knowledge of Hasbro's overprinting of Magic sets was widespread within the Company. FE 5 confirmed that he was familiar with the term "parachute" as used to describe Magic sets. Further, through conversations with Wizards' team in Italy, FE 5 learned that, by 2021, Hasbro's accelerated printing of Magic sets threatened to dilute the values of Magic products on the secondary market. FE 5 stated that it was "common knowledge" that reprinting sets drove down secondary market prices.

186.    By the time Baldur's Gate was released in 2022, Magic buyers who had shelled out increasing amounts of money over the years to buy the ever-expanding set of Magic offerings were unsure whether they would be able to continue buying at this pace. FE 2, who interfaced extensively with Magic buyers—both hobby shops and end consumers—during his tenure as a Community Manager for Magic, heard consistent complaints from buyers that Wizards was putting out too much Magic product, and that this would make it hard for them to continue buying.

187.    FE 2 consistently relayed these concerns (including via an internal feedback reporting software) to his supervisors, Blake Rasmussen and Bryan Nisperos, who reported to and met frequently with Defendant Williams. Rasmussen and Nisperos told FE 2 that they relayed his reports of the buyer directly to Defendant Williams. FE 2 also personally told Defendant Williams about these concerns about future Magic demand at a town hall meeting of Wizards staff. FE 2

61

stated that though Rasmussen, Nisperos and Defendant Williams all acknowledged the feedback from Magic buyers that FE 2 and other community managers communicated, he was told ***not*** to publicly acknowledge the buyers' concerns.

188.    FE 1 explained that Defendant Williams was specifically concerned that Magic distributors, laden with excess inventory of Baldur's Gate and other Magic sets, would not have sufficient cash flow to purchase new Magic sets. In the second half of 2022, Defendant Williams therefore instructed FE 1 to look into granting a line of credit to distributors whose inventory did not sell through, so that they could still buy the next line of Magic releases. FE 1 specifically recalled that Defendant Williams shared her concerns about distributors not being able to buy the next sets after Baldur's Gate with members of the Magic leadership team and commercial teams, including Paul Bazakas, Brian Rose, Brian Trunk and Ken Troop.

189.    By mid-2022, disappointing sales for recent Magic sets underscored to Hasbro leadership the validity of these concerns about damage to Magic demand. FE 4, who served as Senior Director of Marketing at Wizards during the Class Period, confirmed that in the latter half of 2022 and into 2023, Defendants knew about and consistently discussed concerns regarding Magic set overprinting, weak Magic sales that missed Hasbro's forecasts, and the risk of diluting the scarcity of Magic products resold on the secondary market. These discussions, FE 4 stated, took place in weekly executive leadership team meetings that he attended alongside Defendant Williams, Defendant Cocks, and other Company executives including Hasbro's CFO.

190.    FE 4 recalled that these executive leadership team meetings featured updates on planned product launches as well as debriefs after the products had been launched. Specifically, FE 4 stated, planned Magic sets and sets that had been released were discussed in detail in these meetings. In these discussions, Defendants were presented with various metrics showing how

actual sales of Magic sets were trending against Hasbro's sales and demand forecasts. FE 4 added that nobody in these meetings disagreed with the conclusion that Magic sales were suffering because the sales numbers presented in the meetings spoke for themselves.

191.    FE 4 confirmed specifically that meeting participants, including Defendants, discussed the fact that the evident decline in Magic demand was a function of Hasbro's overprinting of Magic sets. Presented with this idea, FE 4 recalled, Defendants asked follow-up questions and directed Wizards staff to try to sell the unsold sets by introducing different marketing schemes and consumer outreach programs.

192.    Confronted with these concerns in the executive leadership team meetings, FE 4 confirmed, Defendants further instructed Wizards personnel to reevaluate the "economy" for printing Magic sets. FE 4 stated that Hasbro evaluated the secondary market for Magic cards, as it helped the Company understand how the fan community viewed the economy for cards. The secondary market was discussed in executive leadership meetings that FE 4 attended.

193.    ***Hasbro personnel who knew about the parachute strategy acknowledged that the BofA Report "caught" management.*** FE 1 recalled that after the BofA Report was published on November 14, 2022, there was recognition within the Company that management had gotten caught, that this was not a good start for Defendant Cocks's tenure as CEO, and that management hated and avoided the analyst who had written the report. At the staff level, FE 1 said, everyone knew that Bank of America had their number. FE 1 added that Hasbro employees from the line staff up to the director level commented that Bank of America got it right with their report.

194.    FE 5 was familiar with the BofA Report when it was published and confirmed that Wizards personnel agreed with its conclusions. When the BofA Report was released, FE 5 discussed it in a Whatsapp group chat with other former and then-current Wizards employees,

63

including Retail Experience Specialist Andrea Vitali, Senior Commercial Director Davide Bonati, and Key Account Manager Frank Hanford—who all agreed that the report was accurate. FE 5 recalled that the group's members agreed that the "overprinting" described by the report was something they all knew about—and moreover that they were glad the report had been released, hoping it would serve as a "reality check" for Hasbro regarding the Company's use of Magic as a cash cow to compensate for revenue shortfalls in other divisions.

195.    FE 4 similarly confirmed that the BofA Report was discussed within Hasbro after it was released, and that Company leadership acknowledged that Hasbro's overprinting of Magic sets was diluting the franchise. FE 3 added that after the BofA Report's release, he attended a quarterly business review meeting at which Hasbro executives including Defendant Cocks discussed the report. At that meeting, FE 3 stated, Hasbro executives expressed fear as to whether the report was true, and the Company's communications personnel, including the Investor Relations team, scrambled to find a response and some way to "fix" the issue. As FE 1 explained, the policy that came from Defendant Cocks and the communications team was to "***deny, deny, deny***."

196.    ***Contrary to her statements to investors, Defendant Williams privately agreed with the BofA Report's view that Hasbro "overprinted" Magic sets.*** FE 1 stated that Defendant Williams shared Bank of America's view, as expressed in its November 14, 2022 report, that Hasbro "overprinted" Magic sets. As FE 1 recalled, Defendant Williams was concerned about the risk of harm to Magic posed by the release of the parachute Magic 30th Set, and worried that the parachute would backfire and suffer from poor sales because it had no actual value but was being sold for nearly $1,000. FE 1 further stated that Defendant Williams' concerns only increased when the Bank of America report came out during the set's production.

197.    ***Defendants knew that the Magic 30th Set did not sell "out of stock" on the day of its release and that the supply of the Magic 30th Set had not been "scaled back" in response to fan feedback.*** Contrary to their public representations on the day of and soon after the release of the Magic 30th Set, Defendants knew that the Magic 30th Set was ***not*** "out of stock" and that the true reason for the abrupt end to the November 28, 2022 release of the Magic 30th Set was Defendants' decision to prematurely cut off the sale in order to mask what Defendants quickly realized would be worse-than-expected sales. Defendants thus also knew that the real reason for the shortened sale was ***not*** a proactive "scal[ing] back" of the available supply in response to customer feedback, as Defendant Williams falsely represented in response to widespread concerns about the sale.

198.    FE 1, who was in the "war room" for the Magic 30th Set release on November 28 with Wizards personnel including Magic SVP Ken Troop, recalled that sales for the set were stopped in a matter of minutes after the release went live in order to mask the immediately evident fact that sales would be weaker than expected—***not*** because the set was out of stock. FE 1 explained that personnel at Wizards, including Defendant Williams, had developed a plan prior to the release date for the Magic 30th Set that called for sales to be cut off and an "out of stock" message to be posted on the sale website in case sales velocities were "underwhelming" after the release went live. Per that predetermined plan, FE 1 recalled, Defendant Williams was in constant contact with the war room for the duration of the foreshortened sale, and Ken Troop had the authority to decide to stop sales.

199.    FE 1 stated that Defendant Cocks knew there was a plan regarding the release of the Magic 30th Set before it was implemented. Corroborating FE 1's recollection, FE 3 stated that Defendant Cocks, in line with his deep involvement in planning and executing strategy for Wizards

and Magic, would have either devised or known about the plan to prematurely cut off sales of the Magic 30th Set due to poor sales velocities.

200.    FE 1 stated that when the set was released at 9:00am Pacific time on November 28, the Wizards personnel in the war room, including FE 1 and Ken Troop, immediately saw that sales velocities were weak. When Troop decided to stop the sale and put up the "out of stock" message, FE 1 said, that decision was immediately relayed to Defendant Williams, and Defendant Williams responded with a thumbs-up, approving the decision. FE 1 also stated that, per ordinary Company practice, Defendant Cocks would have been told about the results and premature closing of the sale soon after it happened, by either Defendant Williams or Ken Troop.

201.    ***Defendants' materially misleading statements concerned the company's most important products and divisions.*** Defendants' materially misleading statements and omissions alleged herein, *see supra* ¶¶142-66, concerned the health and performance of Hasbro's most important business segment, Wizards, as well as its most important single brand, Magic. These misstatements and omissions thus concerned the products and divisions most crucial to Hasbro's success. It is implausible that Defendants—executives of the Company who ***both*** ran its Wizards division—would not be aware of crucial aspects of the business they oversaw.

202.    Wizards, which Defendant Cocks called "an important and vital business for us" and "a major growth driver for the company," consistently accounted for an outsized share of Hasbro's reported operating profits due to its high-margin Magic sets. *See supra* ¶¶34-36.The Magic brand in particular was a key driver of Hasbro's financial success. Magic ***alone*** contributed approximately 15% of Hasbro's ***total*** net revenue in 2021. Defendants repeatedly touted Magic's and Wizards' place at the forefront of Hasbro's future plans, including at the Company's October 4, 2022 Investor Day and in its annual reports. *See supra* ¶¶36, 43.

203.    ***Defendants were deeply involved in the topics of their materially misleading statements.*** As Hasbro executives, Defendants Cocks and Williams were tasked with overseeing the Company's business. As Presidents of Wizards, and—for Defendant Cocks—as CEO, both Executive Defendants were extensively involved in both Wizards' high-level strategic operations and aspects of its granular, day-to-day operations, including those of Magic. It is implausible that Defendants were unaware of the fundamental details about Hasbro's business strategies that comprised the topics of the statements alleged herein, *see supra* ¶¶142-66.

204.    Defendant Cocks was deeply involved in Wizards both during his time as President of Wizards and his tenure as Hasbro CEO. He repeatedly touted his instrumental role in devising and implementing the "segmentation" strategy that purportedly drove the growth of Magic and Wizards through his tenure as President of Wizards. *See, e.g.*, *supra* ¶¶39, 43, 67. Even as CEO, Defendant Cocks continued to act as the de facto head of Wizards. Former Hasbro employees have explained that as CEO, Defendant Cocks spent an outsized amount of time at Wizards' Seattle headquarters, devised and approved plans for Wizards before they were officially presented to Hasbro leadership, and even prepared and delivered much of Defendant Williams' Wizards presentations at high-level quarterly business review meetings. *See supra* ¶¶94-95.

205.    As President of Wizards beginning in February 2022, Defendant Williams was deeply familiar with the Company's Magic business. In addition to regularly attending high-level quarterly business review meetings at which she presented Wizards' plans and the results of its operations over the prior quarter, Defendant Williams frequently interfaced with Defendant Cocks about Wizards and Magic plans—including about the parachute strategy. *See, e.g.*, *supra* ¶93. Former Hasbro employees have explained that Defendant Williams also received regular reports about customer feedback, including that buyers were concerned about the glut of sets Magic had

been pushing into the market and might as a result buy less Magic product in the future. *See supra* ¶¶98-99.

206.    ***Defendants spoke frequently and authoritatively on the topics of their materially misleading statements.*** Defendants made the misleading statements alleged herein, *see supra* ¶¶142-66, in settings and venues such as earnings conference calls and industry conferences, where Defendants regularly addressed market analysts and investors regarding Hasbro's business, inventory situation, and financial results and guidance. Speaking in these settings, and on these topics, required Defendants to assess and understand the veracity of their statements and indicated to the market that Defendants' statements carried official authority. In these statements, Defendants falsely attributed Magic's and Wizards' operations to the purported print-to-demand segmentation strategy, falsely rejected the BofA Report's conclusion that Hasbro was overprinting Magic sets, and falsely asserted that elevated Wizards inventories were due to Magic sets stocked in anticipation of upcoming releases.

*        *        *

207.    The foregoing facts, particularly when considered collectively (as they must be), support a strong inference of Hasbro's and the Executive Defendants' scienter.

## IX.    ADDITIONAL LOSS CAUSATION ALLEGATIONS

208.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, i.e., damages, suffered by Lead Plaintiffs and the Class.

209.    As detailed herein, during the Class Period, Defendants made materially false and misleading statements and omissions that deceived the market. This artificially inflated the prices of Hasbro's common stock and operated as a fraud or deceit on the Class. When Defendants' prior misrepresentations, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market on November 14, 2022, January 26, 2023, and October

26, 2023, the price of Hasbro's stock fell precipitously, as the prior artificial inflation came out of the price.

210.    On November 14, 2022, Bank of America released a report detailing its analysts' investigation into Hasbro's Magic set production and concluding that Hasbro's unsustainable practice of "overprinting" Magic sets posed severe risks to future Magic sales and the long-term value of the Magic brand. The report was based on, among other things, analysts' investigation into retailer inventories and conversations with Magic buyers including players, collectors, distributors, and hobby shops. Contradicting Defendants statements—including that Hasbro was printing "the same number of sets" annually as it had in the past and that sets were printed pursuant to a sustainable "segmentation" strategy based on "what [customers] want"—the report highlighted the negative effects of Hasbro's "overprinting": a decline in Magic secondary market prices, which had been supported by Magic sets' scarcity, and suppression of future demand for Magic sets among distributors, collectors, players, and hobby shops.

211.    As a result of the November 14, 2022, disclosure, Hasbro's stock price declined by $6.25, or approximately 9.9%, from a closing price of $63.41 on November 13, 2022, to a closing price of $57.16 on November 14, 2022, on high volume. This represented a decline of more than $875 million in Hasbro's market capitalization. Commentators immediately attributed the drop in Hasbro's stock price to the BofA Report. On the day of the report's publication, for example, IGN published an article titled "***Hasbro Stock Down After Analysts Criticize Handling of Magic: The Gathering***."

212.    On January 26, 2023, Hasbro issued a press release previewing its financial results for the fiscal fourth quarter and full year of 2022. The release announced that Wizards' year-over-year fourth quarter revenue growth of 22% had substantially missed Hasbro's guidance and

analysts' expectations—for example, BMO's estimate of 36% fourth quarter growth—by double-digits percentages. Wizards' growth for the full fiscal year 2022 was thus also lower than analysts had forecasted.

213.   The poorer-than-expected Wizards results announced in the January 26 release revealed that, as the BofA Report had concluded, Hasbro was unsustainably "overprinting" Magic sets to generate short-term revenue. This contradicted Defendants' statements, including that the Company printed Magic sets "to meet demand" and "player preferences" pursuant to its purported "segmentation" strategy, and that there was "no evidence" that Magic was "overprinted." *See supra* ¶¶114-17.

214.   The January 26 disclosure also revealed that the harm to the Magic brand and sales posed by what former employees called Hasbro's "parachute" strategy had materialized—and, in particular, that the Magic 30th Set had not in fact sold "out of stock" when Defendants said it had. *See supra* ¶¶118-21, 129-31. As former employees confirmed, the Magic 30th Set was among the "parachute" sets Hasbro consistently printed in order to generate short-term revenue to make up for revenue shortfalls in its other divisions, including Consumer Products.

215.   As a result of the January 26, 2023 disclosure, Hasbro's stock price declined by $5.17, or approximately 8.1%, from a closing price of $63.78 on January 26, 2023 to a closing price of $58.61 on January 27, 2023, on high volume. This represented a decline of more than $700 million in Hasbro's market capitalization.

216.   Analysts covering Hasbro immediately connected the worse-than-expected results announced on January 26 with the unsustainable Magic set "overprinting" that the BofA Report had demonstrated in November. For example:

- Reiterating their earlier thesis, Bank of America analysts wrote in a January 27, 2023 report that they "[r]emain[ed] cautious on the Magic business" and "H[asbro]'s

70

fundamental growth drivers," reiterating both their "Underperform" rating for the Company and their "concern[] that *the company has been overproducing Magic: The Gathering in a worsening economic backdrop, which could damage the long-term value of the brand*."

- Analysts from Truist, in a report published January 26, 2023 and subtitled "*Little Magic to Speak Of*," wrote that "*the shortfall in Hasbro's key growth business"—i.e., disappointing Wizards earnings—"will stimulate greater concerns around Hasbro's ability to grow in [20]23."*

- In another January 26, 2023 report, Goldman Sachs analysts asked, "*Is the outlook for a doubling of Wizards of the Coast revenue by 2027 still intact?*"

- In a January 30, 2023, report titled "*Hasbro and the Terrible, Horrible, No Good, Very Bad Quarter*," Pacific Square Research analysts framed the quarter's poor Wizards results as a result of Magic overprinting. Noting that "*[Hasbro] has pitched investors on the long run growth and profitability of the Wizards segment*," the analysts wrote that "*2022 has proven to be a disappointment*" because of "*the excessive number of new card issuances*" and "*the less than successful 30th anniversary card drop*."

- In an article published once Hasbro announced its full earnings, the New York Times cited the BofA Report to explain the worse-than-expected Wizards results that had first been announced in the January 26 disclosure, writing, "Hasbro faces challenges making Magic even bigger, *particularly player fatigue brought on by the release of 39 new card sets last year, up from 15 in 2019, according to an analysis by Bank of America*."

217.    Finally, on October 26, 2023, Hasbro announced in its earnings report and earnings call that inventories in its Wizards division remained more stubbornly elevated than inventories in its other divisions, belying Defendants' prior representations that Wizards inventories reflected only Magic sets that would be released during 2023, and revealing to the market that Wizards' inventories contained old, unsold Magic sets from past releases. The October 26 disclosure thus fully revealed the extent of the harm to Magic sales that had been caused by Hasbro's Magic set overprinting and parachute strategy.

218.    As a result of the October 26, 2023 disclosure, Hasbro's stock price declined by $8.91, or approximately 16.3%, from a closing price of $54.75 on October 25, 2023 to a closing

price of $45.84 on October 27, 2023, on high volume. This represented a decline of more than $1.2 billion in Hasbro's market capitalization.

219.    Analysts reacted to the October 26 disclosure and resulting Hasbro stock price decline. In a report published on October 27, 2023, for example, Roth MKM analysts repeated the Company's disclosure that "owned inventory . . . is down 27% y/y, including a 34% reduction for Consumer Products," and accordingly slashed their expectations for Wizards growth by ***more than half***, from 16.5% to 7%. Morgan Stanley analysts, in a report published the same day, wrote, "we would attribute at least part of the stock price decline to ***the market's dissatisfaction with management communication***."

220.    As illustrated by the chart below, the drop in Hasbro's stock price caused by each of these disclosures was statistically significant, occurring against a backdrop of little to no movement in the wider stock market.

| Date | Disclosure | Price Impact Date | Hasbro Stock Price Change | DJI / S&P 500 / Nasdaq Price Change |
|---|---|---|---|---|
| **Nov. 14, 2022** | Bank of America Report | Nov. 14, 2022 | -9.9% | DJI: -0.6% S&P 500: -0.9% Nasdaq: -1.1% |
| **Jan. 26, 2023** | HAS 4Q&FY22 earnings pre-release | Jan. 27, 2023 | -8.1% | DJI: +0.6% S&P 500: +1.1% Nasdaq: +1.8% |
| **Oct. 26, 2023** | HAS 3Q23 earnings report and call | Oct. 26-27, 2023 | -16.3% | DJI: -1.7% S&P 500: -1.9% Nasdaq: -1.4% |

221.    As described above, the disclosures of November 14, 2022, and January 26, 2023, were not sufficient on their own to fully remove the artificial inflation from Hasbro's stock price because they only partially revealed the conditions, risks and trends that Defendants had concealed from investors. The corrective impact of these disclosures was tempered by Defendants' continued misstatements and omissions, *see supra* ¶¶134-37, 163-66, which maintained the price of Hasbro's

publicly traded shares at artificially inflated levels and induced members of the Class to continue purchasing Hasbro's stock. The full truth was revealed by the disclosure of October 26, 2023, which removed the artificial inflation in Hasbro's stock price that had been caused by Defendants' materially misleading statements and omissions during the Class Period.

## X.    CLASS ACTION ALLEGATIONS

222.    Lead Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class, consisting of all persons and entities that purchased Hasbro common stock between September 16, 2021 and October 26, 2023, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers, and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

223.    The members of the Class are so numerous that the joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Throughout the Class Period, common stock of Hasbro actively traded on the Nasdaq under the symbol "HAS." Millions of Hasbro shares were traded publicly during the Class Period on the Nasdaq. As of the fiscal third quarter of 2025, the Company has approximately 140.34 million shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Hasbro or its transfer agent, and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

224.    Lead Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law as alleged herein.

225.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests that conflict with those of the Class.

226.    Common questions of law and fact exist as to all members of the Class and predominate any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

i.        whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

ii.       whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

iii.      whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders misrepresented material facts about the business, operations, and prospects of Hasbro;

iv.      whether statements made by Defendants to the investing public misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of Hasbro;

v.       whether the market price of Hasbro common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

vi.        the extent to which the members of the Class have sustained damages and the proper measure of damages.

227.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## XI.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

228.    As a result of their purchases of Hasbro's common stock during the Class Period, Lead Plaintiffs and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

229.    To the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Hasbro who knew that the statement was false when made.

## XII.   THE PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

230.    The market for Hasbro common stock was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, Hasbro common stock traded at artificially inflated and/or maintained prices during the Class Period. Lead Plaintiffs and other members of the Class

purchased the Company's common stock relying upon the integrity of the market price of Hasbro common stock and market information relating to Hasbro and have been damaged thereby.

231.    At all relevant times, the market for Hasbro common stock was an efficient market for the following reasons, among others:

  i. Hasbro was listed and actively traded on the Nasdaq, a highly efficient and automated market;

  ii. As a regulated issuer, Hasbro filed periodic public reports with the SEC and/or the Nasdaq;

  iii. Hasbro regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

  iv. Hasbro was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

232.    As a result of the foregoing, the market for Hasbro common stock promptly digested current information regarding Hasbro from all publicly available sources and reflected such information in the Company's stock price. Under these circumstances, all purchasers of Hasbro common stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices, and a presumption of reliance applies.

233.    A Class-wide presumption of reliance is also appropriate in this action under the

Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972),

because the Class's claims are, in large part, grounded in Defendants' material misstatements

and/or omissions. Because this action involves Defendants' failure to disclose material adverse

information regarding the Company's business, operations, and prospects—information that

Defendants were obligated to disclose but did not—positive proof of reliance is not a prerequisite

to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable

investor might have considered them important in the making of investment decisions. Given the

importance of the Class Period material misstatements and omissions set forth above, that

requirement is satisfied here.

## XIII.  COUNTS AGAINST DEFENDANTS

### COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

234.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if

fully set forth herein.

235.    This Count is asserted on behalf of all members of the Class against Defendant

Hasbro and the Executive Defendants for violations of Section 10(b) of the Exchange Act, 15

U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

236.    Defendants carried out a plan, scheme, and course of conduct that was intended to

and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs

and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price

of Hasbro's common stock; and (iii) cause Lead Plaintiffs and other members of the Class to

purchase Hasbro common stock at artificially inflated prices. In furtherance of this unlawful

scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

237.    Defendants made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading in an effort to maintain artificially high market prices for Hasbro common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

238.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Hasbro's business, operations, and prospects, as specified herein. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Hasbro's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Hasbro and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

239.    Each of the Executive Defendants' primary liability, and controlling person liability arises from the following facts: (i) each of the Executive Defendants was a high-level executive at the Company and a member of the Company's management team or had control thereof; (ii) each

of the Executive Defendants, by virtue of their responsibilities and activities as a high-level executive of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Executive Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Executive Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

240.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Hasbro's operating condition, inventory situation, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its common stock. As demonstrated by Defendants' misstatements of the Company's business, operations, and prospects, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

241.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Hasbro common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements

and omissions made by Defendants or upon the integrity of the markets in which the securities trade, and in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Lead Plaintiffs and the other members of the Class purchased Hasbro common stock during the Class Period at artificially inflated prices and were damaged thereby.

242.    At the time of said misrepresentations and omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Lead Plaintiffs and the other members of the Class and the marketplace known of the truth regarding the problems that Hasbro was experiencing, which were not disclosed by Defendants, Lead Plaintiffs and other members of the Class would not have purchased Hasbro common stock, or, if they had purchased such shares during the Class Period, they would not have done so at the artificially inflated prices that they paid.

243.    By virtue of the foregoing, Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

244.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Executive Defendants

245.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

246.    The Executive Defendants acted as controlling persons of Hasbro within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level

positions with the Company, participation in and awareness of the Company's operations, and intimate knowledge of the misstatements and material omissions disseminated by the Company to the investing public, the Executive Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements and omissions that Lead Plaintiffs contend are false and misleading. Each of the Executive Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

247.    In particular, the Executive Defendants had direct and supervisory involvement in the day-to-day operations of the Company and its Wizards division and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

248.    As set forth above, Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XIV.    PRAYER FOR RELIEF

249.    WHEREFORE, Lead Plaintiffs, individually and on behalf of the Class, pray for relief and judgment as follows:

       i.    Declaring this action to be a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

    ii.    Awarding Lead Plaintiffs and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

    iii.    Awarding Lead Plaintiffs and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

    iv.    Awarding such other and further relief as this Court deems appropriate.

## XV.   JURY DEMAND

250.    Lead Plaintiffs demand a trial by jury.

Dated: November 26, 2025          Respectfully submitted,

          By: */s/ Jonathan D. Uslaner*

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
Jonathan D. Uslaner
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
(310) 819-3481
jonathanu@blbglaw.com

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
Matthew S. Goldstein
1251 Avenue of the Americas, 44th Floor
New York, NY 10020
(212) 554-1400
matthew.goldstein@blbglaw.com

*Lead Counsel for Lead Plaintiffs West Palm Beach Firefighters' Pension Fund and City of Miami General Employees' & Sanitation Employees' Retirement Trust*

**KLAUSNER, KAUFMAN, JENSEN**
  **& LEVINSON**
Robert D. Klausner
7080 Northwest Fourth Street

82

Plantation, Florida 33317
Telephone: (954) 916-1202
Facsimile: (954) 916-1232
bob@robertdklausner.com

*Additional Counsel for Lead Plaintiffs West Palm Beach Firefighters' Pension Fund and City of Miami General Employees' & Sanitation Employees' Retirement Trust*