UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

WEST PALM BEACH FIREFIGHTERS'   :
PENSION FUND and CITY OF MIAMI   :
GENERAL EMPLOYEES' & SANITATION  :
EMPLOYEES' RETIREMENT TRUST,   :
Individually and on Behalf of All Others  :
Similarly Situated,   :
   :   24-CV-8633 (VSB)
       Plaintiffs,   :
   :
     - against -   :
   :
HASBRO, INC., CHRISTIAN COCKS, and  :
CYNTHIA WILLIAMS,   :
   :
       Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

Scott D. Musoff
Christopher R. Fredmonski
Jemma M. Curtin
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
(212) 735-3000

*Attorneys for Defendants Hasbro, Inc.,*
*Christian Cocks, and Cynthia Williams*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 4

    A.    Hasbro's Business and the Magic "Segmentation" Strategy .................................. 4

    B.    2022 Is a Record-Breaking Year for Magic Despite Some Setbacks ..................... 6

    C.    Magic Remains Successful in 2023
         While Consumer Products Faces Headwinds ........................................................ 8

ARGUMENT ................................................................................................................. 9

I.      PLAINTIFFS' CLAIMS ARE TIME-BARRED ................................................. 9

    A.    Plaintiffs' Claims Accrued More
         Than Two Years Before They Filed the AC ........................................................ 10

    B.    Plaintiffs' Claims Do Not Relate Back
         to the Filing of the Original Complaint ............................................................... 11

II.     PLAINTIFFS HAVE NOT STATED A CLAIM UNDER SECTION 10(B) ................. 13

    A.    Plaintiffs Have Not Pled A Material Misrepresentation or Omission .................. 13

         1.    Plaintiffs Fail to Challenge the
               "Segmentation" Strategy Statements ........................................................ 13

         2.    Plaintiffs' Focus on the Magic 30th Set Is Misguided ............................. 17

         3.    Plaintiffs Fail to Challenge the 1Q23 Inventory Statements .................... 19

    B.    Plaintiffs Have Not Pled Scienter ....................................................................... 20

         1.    Plaintiffs' Scienter Allegations Fail Under the PSLRA ........................... 20

         2.    Any Inference of Scienter Is Less Compelling
               Than Any Opposing Inferences of Nonfraudulent Intent .......................... 23

    C.    Plaintiffs Have Not Pled Loss Causation ............................................................ 24

III.    PLAINTIFFS HAVE NOT PLED A CLAIM UNDER SECTION 20(A) ..................... 27

CONCLUSION ............................................................................................................. 27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*Arco Capital Corp. v. Deutsche Bank AG*,
  986 F. Supp. 2d 296 (S.D.N.Y. 2013) ................................................................. 10

*Arkansas Public Employees Retirement System v. Bristol-Myers Squibb Co.*,
  28 F.4th 343 (2d Cir. 2022) ....................................................................... 13, 20

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) .......................................................................... 9, 27

*Born v. Quad/Graphics, Inc.*,
  521 F. Supp. 3d 469 (S.D.N.Y. 2021) ............................................................ 26

*Caldwell v. Berlind*,
  543 F. App'x 37 (2d Cir. 2013) ...................................................................... 12

*Cheng v. Canada Goose Holdings Inc.*,
  No. 19-CV-8204 (VSB), 2021 WL 3077469 (S.D.N.Y. July 19, 2021) ................... *passim*

*City of Pontiac General Employees' Retirement System v. MBIA, Inc.*,
  637 F.3d 169 (2d Cir. 2011) ............................................................................ 9

*City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014) ................................................................... 9, 20, 27

*Docdeer Foundation v. BioNTech SE*,
  No. 24 Civ. 5310 (KPF), 2025 WL 2781381 (S.D.N.Y. Sept. 30, 2025) ................... 15

*ECA v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ................................................................. 18, 19, 23

*Fogel v. Wal-Mart de México SAB de CV*,
  No. 13 Civ. 2282 (KPF), 2017 WL 751155 (S.D.N.Y. Feb. 27, 2017),
  *aff'd sub nom.*, *Fogel v. Vega*, 759 F. App'x 18 (2d Cir. 2018) ................... 11, 12, 13

*In re Francesca's Holdings Corp. Securities Litigation*,
  No. 13-cv-6882 (RJS), 2015 WL 1600464 (S.D.N.Y. Mar. 31, 2015) ..................... 27

*In re FuBoTV Inc. Securities Litigation*,
  No. 21-cv-01412 (ALC), 2024 WL 1330001 (S.D.N.Y. Mar. 28, 2024) ................... 9

*Gavin/Solmonese LLC v. D'Arnaud-Taylor*,
  68 F. Supp. 3d 530 (S.D.N.Y. 2014), *aff'd*, 639 F. App'x 664 (2d Cir. 2016) ............... 10

*Jackson v. Abernathy*,
   960 F.3d 94 (2d Cir. 2020) ............................................................................................. 23

*Janbay v. Canadian Solar, Inc.*,
   No. 10 Civ. 4430 (RWS), 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ......................... 27

*Janus Capital Group, Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011) ...................................................................................................... 13

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001) ........................................................................................... 24

*Lehman XS Trust, Series 2006-GP2, (LXS 2006-GP2),*
   *ex rel. U.S. Bank National Ass'n v. GreenPoint Mortgage Funding, Inc.*,
   916 F.3d 116 (2d Cir. 2019) ........................................................................................... 11

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) ................................................................................. 4, 13, 25

*Long Miao v. Fanhua, Inc.*,
   442 F. Supp. 3d 774 (S.D.N.Y. 2020) .............................................................................. 17

*In re Lululemon Securities Litigation*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) ....... 17, 20, 24

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
   601 U.S. 257 (2024) ...................................................................................................... 13

*Nguyen v. Endologix, Inc.*,
   962 F.3d 405 (9th Cir. 2020) .......................................................................................... 24

*In re Noah Education Holdings, Ltd. Sec. Litig.*,
   No. 08 Civ. 9203(RJS), 2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) ............................ 12

*Nurlybayev v. ZTO Express (Cayman) Inc.*,
   No. 17 CV 6130-LTS-SN, 2021 WL 1226865 (S.D.N.Y. Mar. 31, 2021) ................... 11, 12

*In re Philip Morris International Inc. Securities Litigation*,
   437 F. Supp. 3d 329 (S.D.N.Y. 2020), *aff'd*, 89 F.4th 408 (2d Cir. 2023) ...................... 16

*In re Philip Morris International Inc. Securities Litigation*,
   89 F.4th 408 (2d Cir. 2023) ........................................................................................... 13

*Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*,
   11 F.4th 90 (2d Cir. 2021) ............................................................................................. 13

*Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v. Fairfax Financial Holdings, Ltd.*,
    886 F. Supp. 2d 328 (S.D.N.Y. 2012) ................................................................. 25

*In re Pretium Resources Inc. Securities Litigation*,
    256 F. Supp. 3d 459 (S.D.N.Y. 2017),
    *aff'd sub nom. Martin v. Quartermain*, 732 F. App'x 37 (2d Cir. 2018) ............... 9, 20, 23

*In re ProShares Trust Securities Litigation*,
    728 F.3d 96 (2d Cir. 2013) ..................................................................... 18, 19

*In re PXRE Group, Ltd. Securities Litigation*,
    600 F. Supp. 2d 510 (S.D.N.Y. 2009),
    *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009) ................. 22

*Sachsenberg v. IRSA Inversiones y Representaciones Sociedad, Anónima*,
    339 F. Supp. 3d 169 (S.D.N.Y. 2018) .................................................... 4, 20, 23

*In re Sanofi Securities Litigation*,
    87 F. Supp. 3d 510 (S.D.N.Y. 2015),
    *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016) ........................................ 14

*Schiro v. Cemex, S.A.B. de C.V.*,
    438 F. Supp. 3d 194 (S.D.N.Y. 2020) ................................................................. 11

*Shemian v. Research In Motion Ltd.*,
    No. 11 Civ. 4068(RJS), 2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013),
    *aff'd*, 570 F. App'x 32 (2d Cir. 2014) ................................................................. 21

*In re Stemline Therapeutics, Inc. Securities Litigation*,
    313 F. Supp. 3d 543 (S.D.N.Y. 2018) ................................................................. 15

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008) ................................................................................ 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ................................................................................ 4, 9, 20, 23

*In re UiPath, Inc. Securities Litigation*,
    No. 24 Civ. 4702 (JPC), 2025 WL 2065093 (S.D.N.Y. July 23, 2025) ..................... 25, 26

*In re Wachovia Equity Securities Litigation*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011) ................................................................. 22

*In re Weight Watchers International Inc. Securities Litigation*,
    504 F. Supp. 3d 224 (S.D.N.Y. 2020) ................................................................. 17

## STATUTES AND RULES

15 U.S.C. § 78u-4(b)(2)(A) ........................................................................................20

15 U.S.C. § 78u-5 ......................................................................................................16

28 U.S.C. § 1658(b)(1) ............................................................................................2, 9

Fed. R. Civ. P. 11(b) ..................................................................................................11

Fed. R. Civ. P. 15(c)(1) .........................................................................................11, 12

Defendants Hasbro, Inc., Christian Cocks, and Cynthia Williams respectfully submit this brief in support of their motion to dismiss the Amended Complaint (ECF No. 47, the "AC").[1]

## PRELIMINARY STATEMENT

In the AC, Plaintiffs have completely abandoned the original complaint, which concerned Hasbro's inventory of toys and games for its Consumer Products business segment.  Now, Plaintiffs have embarked on an entirely new—but equally misguided—effort to recover alleged losses they claim were caused by purported misrepresentations concerning Magic: The Gathering ("Magic"), a brand residing in an entirely different segment of Hasbro's business.  Ironically, Magic was (and remains) the poster child of success in Hasbro's portfolio.  Plaintiffs do not (and cannot) offer any particularized facts to support their untenable assertion that Defendants were damaging the brand and lying to investors during the alleged Class Period.

Released in 1993 as the world's first collectible trading-card game, Magic is a worldwide phenomenon that has been played by over 50 million fans in over 150 countries.  Its strategic gameplay, compelling characters, and fantastic Multiverse have entertained and delighted fans for over 30 years.  Through strong business management and a proven market "segmentation" strategy, Hasbro tripled its Magic business between 2016 and 2022, leading Magic to become Hasbro's first billion-dollar brand in 2022 and delivering joy to more players than ever before.

Despite Magic's incontrovertible success, Plaintiffs have seized on a November 14, 2022 analyst report (the "Report") that Plaintiffs know turned out to be wrong.  The analyst downgraded Hasbro's rating to "underperform" based on his opinion that Hasbro was "overproducing" Magic cards and "destroying the long-term value of the brand."  (AC ¶¶ 49, 56.)  Contrary to the analyst's erroneous prediction, Magic's brand value is stronger than ever,

---

[1] Unless otherwise noted, all emphasis is added and internal citations are omitted.  Referenced exhibits are attached to the Declaration of Scott D. Musoff, filed herewith.

surpassing $1 billion in each of 2023 and 2024, and community engagement with the Magic brand continues to hit new highs.  Notably, when Plaintiffs filed the AC, Hasbro's stock price was trading almost 30% higher than it was just before publication of the Report.

Even so, Plaintiffs strain to repurpose the Report's central thesis and claim that Defendants falsely attributed Magic's historical success—including six years of consecutive growth between 2018 and 2023—to its "segmentation" strategy as a cover-up for a purported "parachute strategy" that allegedly used Magic set releases "to address shortfalls elsewhere in the Company's business."  (*Id.* ¶ 11.)  Plaintiffs do not (and cannot) allege any inconsistency between these two strategies, the first of which concerns the *target players* for various Magic product releases (i.e., "who"), and the second of which concerns the *timing* for such releases (i.e., "when").  Plaintiffs then claim that the supposed "fraud" was revealed when Hasbro reported allegedly disappointing results in January and October, 2023—obfuscating that these results had nothing to do with Magic, but rather were driven by separate business segments.  Plaintiffs' theory of fraud is meritless, and the AC should be dismissed for several reasons.

*First*, Plaintiffs' claims are time-barred.  Plaintiffs' claims accrued no later than October 26, 2023, when they allege that the "full truth" about the purported fraud "finally emerged."  (*Id.* ¶ 17.)  Plaintiffs thus had until October 26, 2025, or two years, to file the AC.  *See* 28 U.S.C. § 1658(b)(1).  Yet they waited until November 26, 2025, to do so, making the AC untimely. (*Infra* Part I.A.)  Plaintiffs' claims do not "relate back" to the original complaint because that complaint is based on entirely different factual allegations:  alleged misrepresentations concerning Hasbro's inventory for its Consumer Products segment.  (*Infra* Part I.B.)

*Second*, Plaintiffs fail to plead a single material misrepresentation or omission.  The AC lacks any facts, particularized or otherwise, showing that any of the challenged statements were

false or misleading when made.  For example, Plaintiffs allege that Defendants falsely attributed

Magic's growth to a "segmentation" strategy that Plaintiffs contend was unsustainable despite its

proven success.  But Plaintiffs plead no facts showing that Hasbro did not pursue the strategy,

nor do they (or can they) articulate any contradiction between that strategy and the allegedly

alternative "parachute" strategy that they trumpet in the AC.  (*Infra* Part II.A.1.a.)  Plaintiffs also

do not (and cannot) plead any particularized, contemporaneous facts contradicting Defendants'

statements that the Report's "overprinting" concerns were unfounded.  (*Infra* Part II.A.1.b.)

Grasping at straws, Plaintiffs try to contort an "out of stock" message on the player-

facing website for Magic's 30th anniversary set (the "Magic 30th Set") into a misrepresentation

that the product had sold out.  But Defendants were transparent with investors that Hasbro had

"pulled back on available supply" of the product (Ex. A, 4Q22 Earnings Call, at 5), and Plaintiffs

do not allege any facts supporting a plausible inference that the Magic 30th Set was material to

Hasbro's business.  (*Infra* Part II.A.2.)  Finally, Plaintiffs allege that Defendants misleadingly

discussed Hasbro's inventory levels in 2023 by relying on vague former-employee accounts from

"mid-2022."  (AC ¶¶ 164, 166.)  Such accounts of course cannot show that Defendants' 2023

statements were false or misleading ***when made***.  (*Infra* Part II.A.3.)

*Third*, Plaintiffs fail to plead any inference of scienter, much less a strong one.  Plaintiffs

do not allege that any Defendant had a motive or opportunity to defraud investors.  Instead,

Plaintiffs rely on a "hodgepodge of circumstantial evidence" that "amount[s] to little more than a

suggestion that 'Defendants must have known' their statements were false when they made

them" based on their high-level positions at Hasbro and involvement with Magic.  *Cheng v.

Canada Goose Holdings Inc.*, No. 19-CV-8204 (VSB), 2021 WL 3077469, at *11 (S.D.N.Y.

July 19, 2021) (Broderick, J.).  Lacking here are any particularized factual allegations showing

that specific contradictory information was available to Defendants when they made any of the allegedly misleading statements.  (*Infra* Part II.B.1.)  The result is an inference of scienter that simply makes no sense, and one that is far less compelling than an inference that Defendants believed that their statements were accurate when made.  (*Infra* Part II.B.2.)

*Fourth*, Plaintiffs fail to plead loss causation.  While they have latched onto three instances when Hasbro's stock price declined, they plead no connection between the alleged "corrective disclosures" and anything that Defendants actually said.  (*Infra* Part II.C.)  "This is fatal" to their claims.  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005).

*Finally*, Plaintiffs' failure to plead a primary violation of Section 10(b) forecloses their "control person" claim under Section 20(a).  (*Infra* Part III.)

## STATEMENT OF FACTS[2]

### A.    Hasbro's Business and the Magic "Segmentation" Strategy

Hasbro is a leading game, intellectual property, and toy company that delivers engaging brand experiences for global audiences through gaming, consumer products, and entertainment, with a portfolio of iconic brands, including Magic, Dungeons & Dragons, Monopoly, Transformers, Play-Doh, and Peppa Pig.  (AC ¶¶ 2, 25.)  Hasbro has three reportable business segments:  Consumer Products, Wizards of the Coast and Digital Gaming ("Wizards"), and Entertainment.  (*Id.* ¶ 29.)  Christian Cocks has been Hasbro's CEO since February 2022; before that, he was the President of Wizards.  (*Id.* ¶ 26.)  Cynthia Williams was the President of Wizards from February 2022 to April 2024.  (*Id.* ¶ 27.)

---

[2] The facts are drawn from the AC, the "documents incorporated into the [AC] by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).  The Court may consider any "legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  *Sachsenberg v. IRSA Inversiones y Representaciones Sociedad Anónima*, 339 F. Supp. 3d 169, 178 (S.D.N.Y. 2018) (Broderick, J.).

The Wizards segment develops trading-card, role-playing, and digital-game experiences for certain of the Company's brands, including Magic. (*Id.* ¶ 25.) Created in 1993, Magic was the world's first collectible trading-card game and Hasbro's first billion-dollar brand. (*Id.* ¶¶ 6, 30.) Hasbro periodically releases themed "sets" of Magic cards that players can use to build custom decks and face off against each other. (*Id.* ¶ 2.)

Historically, Hasbro had focused the Magic brand on competitive players and anchored the business around the "Wizards Play Network": a global network of hobby stores that sell Magic cards and host events for competitive players. (*Id.* ¶¶ 30-31; Ex. B, 11/11/21 Jefferies Conf., at 7-8.) When Cocks became President of Wizards in 2016, Wizards identified an opportunity to offer Magic to a broader group of fans beyond just competitive players. Hasbro then deployed a "segmentation" strategy for Magic and developed "bespoke" products for five player groups, or "segments": (1) competitive players, (2) casual, social players, (3) collectors, (4) digital players, and (5) fans of "adjacent" universes (e.g., Dungeons & Dragons, Lord of the Rings, etc.). (Ex. B, 11/11/21 Jefferies Conf., at 9-10; AC ¶¶ 38-39.) Recognizing that players can interact with and enjoy the Magic brand for different reasons, Hasbro believed that "thinking about things on a segmented basis" was a "real driver" for Magic's potential growth. (AC ¶ 39.)

Hasbro typically releases five or six core, or "tentpole," Magic sets per year that are intended to appeal to a broad, "multisegment" player base. (Ex. B, 11/11/21 Jefferies Conf., at 10; Ex. C, 12/8/22 Special Call, at 7-8.) Hasbro also periodically releases smaller, limited-run products targeted at specific player segments. For example, in 2019, Hasbro launched its "Secret Lair" line of cards for collectors comprising small-run reprints of existing cards with unique art treatments. (AC ¶¶ 84, 148; Ex. D, 9/16/21 Special Call, at 6.) For social players, Hasbro launched its "Commander" products, which support multi-player formats, compared to the

traditional two-player, head-to-head format.  (Ex. A, 4Q22 Earnings Call, at 18; AC ¶ 173.)  For "adjacent" players, Hasbro launched its "Universes Beyond" product line, which brings brands like Lord of the Rings and Stranger Things to Magic.  (Ex. E, 1Q22 Earnings Call, at 16; Ex. B, 11/11/21 Jefferies Conf., at 10-11; AC ¶ 163.)  And for the digital segment, Hasbro developed an online "Magic: The Gathering Arena" platform to introduce players to Magic and help them improve their play.  (AC ¶ 4.)

**B.**      **2022 Is a Record-Breaking Year for Magic Despite Some Setbacks**

2022 was a record year for Magic, which exceeded $1 billion in revenue for the first time in the brand's history, up 7% over 2021 revenue.  (*Id.* ¶ 6; Ex. F, 2/16/23 8-K, at 6.)  Also for the first time, each of the tentpole Magic set releases in 2022 achieved more than $100 million in revenue.  (Ex. F, 2/16/23 8-K, at 6; Ex. G, 3Q22 Earnings Call, at 12.)  Hasbro reported that Magic generated $263.2 million in revenue in the fourth quarter of 2022 alone, ***up 40%*** from the fourth quarter of the prior year.  (Ex. F, 2/16/23 8-K, at 6.)  Magic achieved these results despite disclosed supply chain issues that impacted Magic's release cadence in the third quarter of 2022.  (Ex. A, 4Q22 Earnings Call, at 6-7, 12-13; Ex. C, 12/8/22 Special Call, at 9.)

On November 28, 2022, Hasbro released the special-edition Magic 30th Set, which retailed for $999.  (AC ¶¶ 45, 55, 61.)  Hasbro transparently disclosed to investors that the release was not considered successful:  Magic fans were upset by the high price point and Hasbro's decision to produce cards found in iconic Magic sets that were not sanctioned for competitive play.  (Ex. C, 12/8/22 Special Call, at 11; AC ¶ 55.)  Plaintiffs allege that initial sales "indicated that the set would sell poorly" and that Hasbro "prematurely stopped the sale" and updated its player-facing website to cut back on available supply (AC ¶ 74):[3]

---

[3] Magic: The Gathering 30th Anniversary Edition, https://30thedition.wizards.com/us/en (last visited Feb. 6, 2026).



On December 8, 2022, Hasbro held an analyst call, in part to address a November 14, 2022 analyst report that expressed "concern [] that Hasbro ha[d] been overproducing Magic cards" in a way that could "damag[e] the long-term value of the brand" and "lead to lower demand for future releases." (Ex. H, Report, at 1-2; AC ¶¶ 49-56, 65.) During the call, Williams stated that there was "no evidence that MAGIC [was] overprinted." (Ex. C, 12/8/22 Special Call, at 10-11; AC ¶ 66.) Williams explained that "[m]ost of [the] MAGIC releases and our SKUs are print to demand," meaning that Hasbro "print[s] and reprint[s] products to meet demand from [its] players," and that Hasbro was serving "more player segments" than ever before pursuant to its previously disclosed "segmentation strategy." (Ex. C, 12/8/22 Special Call, at 9-11; AC ¶¶ 67-68.) With respect to the Magic 30th Set, Williams informed investors that Hasbro had "scaled back" available supply in response to "customer feedback." (AC ¶ 64.)

On January 26, 2023, Hasbro reported that "[d]espite strong growth in Wizards," its "Consumer Products business underperformed in the fourth quarter [of 2022]." (Ex. I, 1/27/23 8-K, at 3; AC ¶ 120.) Preliminary fourth quarter Consumer Products revenue was down 26% year over year, and full-year revenue was down 10%. (Ex. I, 1/27/23 8-K, at 3-4.) Hasbro also "announced leadership and organizational changes, including the elimination of approximately 15% of its global workforce" and the departure of its President and COO, Eric Nyman, who had

overseen the Consumer Products division.  (*Id.*; AC ¶ 120.)

**C.**    **Magic Remains Successful in 2023 While Consumer Products Faces Headwinds**

On April 27, 2023, Hasbro reported that first-quarter Magic revenue increased 16% year over year relative to 1Q22, while Consumer Products revenue declined 23% for that period.  (Ex. J, 1Q23 Earnings Call, at 4-5.)  During an earnings call that day, Hasbro's Executive VP and CFO Deborah Thomas explained that "inventory at Hasbro [was] up from year-end, due primarily to" (i) higher Wizards inventories "given the timing of releases" for 2023 and (ii) "Consumer Product[s] inventories."  (*Id.* at 6; AC ¶¶ 134, 163.)  Thomas stated that Hasbro "expect[ed] Wizards' inventories to be down" by "year-end."  (Ex. J, 1Q23 Earnings Call, at 6.)

On October 26, 2023, Hasbro reported third-quarter Magic revenue of $287.4 million, ***up 20% year over year*** relative to 3Q22.  (Ex. K, 10/26/23 8-K, at 7.)  Hasbro also reported a "[r]evenue decrease of 18%" for Consumer Products, "driven by exited businesses, industry trends, and prioritization of inventory management."  (*Id.* at 6.)  Hasbro stated that it had "[r]educed owned inventory [by] 27% companywide, but that Consumer Products inventories decreased by 34%."  (AC ¶ 138.)  Responding to an analyst question concerning "how much headwind [Hasbro] saw from destocking this year ***in the Consumer Products business***," Executive VP and CFO Gina Goetter stated, "I would put that at roughly, call it, $50-ish million of onetime cost that . . . we're putting in either move through inventory at the retailer level, extra marketing to move through the inventory, extra obsolescence cost."  (Ex. L, 3Q23 Earnings Call, at 13; AC ¶ 138.)  Based on its results, Hasbro adjusted its full-year 2023 revenue guidance from "down low-single digits" to a "decline of 13 - 15% driven by softer toy outlook ***in Consumer Products***."  (*Compare* Ex. F, 2/16/23 8-K, at 6, *with* Ex. K, 10/26/23 8-K, at 7.)

Magic has continued to prove the Report wrong since the Class Period ended on October 26, 2023, surpassing $1 billion in revenue in each of 2023 and 2024.  (*See* Ex. M, 2/20/25 8-K, at

16.)  Indeed, by the time Plaintiffs filed the AC, Hasbro's stock price had completely recovered, trading almost ***30% higher*** than it was immediately before publication of the Report.  (*See* Ex. N, Hasbro Stock Price Chart, at 10, 34.)[4]

## ARGUMENT

As this Court is aware, securities-fraud complaints must satisfy the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 9(b) of the Federal Rules of Civil Procedure.  *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014); *see also In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 470 (S.D.N.Y. 2017) (Broderick, J.) (describing "heightened pleading requirements"), *aff'd sub nom. Martin v. Quartermain*, 732 F. App'x 37 (2d Cir. 2018).  These standards "require[] plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud."  *Tellabs*, 551 U.S. at 313.  Even under Rule 8(a)'s baseline standards, "[a]llegations that are conclusory or unsupported by factual assertions are insufficient" to state a claim.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

## I.    PLAINTIFFS' CLAIMS ARE TIME-BARRED

The AC should be dismissed because it is time-barred.  Claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 must be brought no later than "2 years after the discovery of the facts constituting the violation."  28 U.S.C. § 1658(b)(1).  A fact is deemed "discovered" when "a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint."  *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*,

---

[4] The Court "may take judicial notice of well-publicized stock prices."  *In re FuBoTV Inc. Sec. Litig.*, No. 21-cv-01412 (ALC), 2024 WL 1330001, at *4 (S.D.N.Y. Mar. 28, 2024) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000)).

637 F.3d 169, 175 (2d Cir. 2011).  To determine the discovery date, courts must "consider when

'storm warnings' would have prompted a reasonably diligent plaintiff to begin investigating."

*Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 68 F. Supp. 3d 530, 535 (S.D.N.Y. 2014) (quoting

*Merck & Co. v. Reynolds*, 559 U.S. 633, 652 (2010)), *aff'd*, 639 F. App'x 664 (2d Cir. 2016).

"[C]ourts in this district often make this determination on a motion to dismiss."  *Id.* at 536; *see

also, e.g.*, *Arco Cap. Corp. v. Deutsche Bank AG*, 986 F. Supp. 2d 296, 304 (S.D.N.Y. 2013)

(dismissing time-barred claims).  Here, Plaintiffs' claims accrued more than two years before

they filed the AC, which does not relate back to the original complaint.

**A.**     **Plaintiffs' Claims Accrued More Than Two Years Before They Filed the AC**

Plaintiffs' claims accrued no later than October 26, 2023, when Plaintiffs themselves

allege that the full truth was revealed to the market—more than two years before they filed the

AC.  Plaintiffs allege that "the truth" about the supposed fraud was revealed through three

disclosures.  (AC ¶¶ 114, 118, 138.)  First, Plaintiffs allege that on November 14, 2022, the

Report revealed that Hasbro had been "overprinting" Magic sets—a conclusion that Plaintiffs

claim "conflicted directly" with Defendants' statements "that Hasbro was printing 'the same

number of sets' annually as it had in the past and that sets were printed pursuant to a sustainable

'segmentation' strategy."  (*Id.* ¶¶ 52, 114, 210.)  Second, Plaintiffs allege that when Hasbro

announced "poorer-than-expected Wizards results" on January 26, 2023, it purportedly

"confirmed that, as the [] Report had indicated, Hasbro was 'overprinting' Magic sets."  (*Id.*

¶¶ 118, 121.)  Third, Plaintiffs allege that the "full truth" of the supposed fraud was "finally

revealed" on October 26, 2023, when Hasbro purportedly divulged that "Wizards' inventories

contained old, unsold Magic sets from past releases" and thus "the extent of the harm to Magic

sales that had been caused by Hasbro's Magic set overprinting."  (*Id.* ¶¶ 138, 217.)

The AC shows that these alleged corrective "disclosures provided sufficient information

to enable Plaintiffs to plead [their] claim[s] and trigger the statute of limitations" more than two years before Plaintiffs filed the AC. *Schiro v. Cemex, S.A.B. de C.V.*, 438 F. Supp. 3d 194, 201 (S.D.N.Y. 2020). This is particularly true for the purported "bombshell" Report (AC ¶ 49), which underpins Plaintiffs' theory of fraud. *See, e.g.*, *Fogel v. Wal-Mart de México SAB de CV*, No. 13 Civ. 2282 (KPF), 2017 WL 751155, at *3, *9 (S.D.N.Y. Feb. 27, 2017) (limitations period began to run after publication of *New York Times* article that "exposed an internal investigation of alleged bribery," which formed the basis of the plaintiffs' claims), *aff'd sub nom. Fogel v. Vega*, 759 F. App'x 18 (2d Cir. 2018).

There is no reason why a reasonably diligent plaintiff would have needed ***until November 26, 2025*** to file the AC. Indeed, Plaintiffs' counsel should have had sufficient facts to plead scienter when they filed the original complaint more than a year earlier on November 13, 2024, *see* Fed. R. Civ. P. 11(b), and Plaintiffs cite nothing post-dating that complaint to support their new claims. The AC thus is time-barred.

**B.    Plaintiffs' Claims Do Not Relate Back to the Filing of the Original Complaint**

The relation-back doctrine cannot save the untimely AC from dismissal. An amended complaint relates back to an original complaint only when it "asserts a claim . . . that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). "New claims may arise out of the same conduct, transactions, or occurrence where they 'amplify, or state in a slightly different way,' the claim of the original pleading" or "are a natural offshoot of the basic scheme already alleged." *Nurlybayev v. ZTO Express (Cayman) Inc.*, No. 17 CV 6130-LTS-SN, 2021 WL 1226865, at *4 (S.D.N.Y. Mar. 31, 2021) (quoting *Slayton v. Am. Exp. Co.*, 460 F.3d 215, 229 (2d Cir. 2006)). In contrast, "claims that are based on an entirely distinct set of factual allegations will not relate back." *Lehman XS Tr., Series 2006-GP2, (LXS 2006-GP2), ex rel. U.S. Bank Nat'l Ass'n v.*

*GreenPoint Mortg. Funding, Inc.*, 916 F.3d 116, 128 (2d Cir. 2019); *see also In re Noah Educ. Holdings, Ltd. Sec. Litig.*, No. 08 Civ. 9203(RJS), 2010 WL 1372709, at *9 (S.D.N.Y. Mar. 31, 2010) ("[R]elation back is only appropriate in securities actions where the new allegations relate to the same or similar conduct complained of in the original complaint." (collecting cases)).

The AC "fall[s] into the latter category." *Fogel*, 2017 WL 751155, at *13. The original complaint alleged that Hasbro, Cocks, and four other executives (none of whom are named as defendants in the AC) misled investors about the state of Hasbro's inventory for its "Consumer Products segment." (ECF No. 1 ¶¶ 10, 24-25, 28, 46.) The AC, however, "is based on an entirely new theory encompassing different conduct." *Caldwell v. Berlind*, 543 F. App'x 37, 40 (2d Cir. 2013). Now, Plaintiffs allege that Defendants misled investors about the extent to which "Hasbro was overprinting Magic sets" to "generat[e] short-term revenue to make up for shortfalls elsewhere in the Company's business." (AC ¶ 1.)

The original complaint's theory of fraud did not concern Magic at all, much less the "overprinting" theory alleged in the AC. Nor did it even mention Williams, who was newly added as a defendant in the AC. Williams's complete absence from the original complaint "must be considered a matter of choice, not mistake." *Fogel*, 2017 WL 751155, at *12 (quoting *In re Enter. Mortg. Acceptance Co., LLC, Sec. Litig.*, 391 F.3d 401, 405 n.2 (2d Cir. 2004)); *see also* Fed. R. Civ. P. 15(c)(1)(C) (new parties in an amended pleading). Moreover, proof of Plaintiffs' current claims "would require different evidence" than would the "prior claims." *ZTO Express*, 2021 WL 1226865, at *4. Because the original complaint "did not put [Hasbro, Cocks, or Williams] on notice that Plaintiff[s] would later bring these new claims," the AC should be

dismissed as untimely.  *Fogel*, 2017 WL 751155, at \*13.[5]

## II.    PLAINTIFFS HAVE NOT STATED A CLAIM UNDER SECTION 10(B)

To state a claim under Section 10(b), Plaintiffs must plead, among other things, (1) a

material misrepresentation or omission, (2) scienter, and (3) loss causation.  *In re Philip Morris

Int'l Inc. Sec. Litig.*, 89 F.4th 408, 417 (2d Cir. 2023).  Plaintiffs have not done so.[6]

### A.    Plaintiffs Have Not Pled a Material Misrepresentation or Omission

Rule 10b-5(b) prohibits "false statements" and misleading "half-truths."  *Macquarie

Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024).  In either case, the

plaintiff "must specify each statement alleged to have been misleading, and the reason or reasons

why the statement is misleading."  *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28

F.4th 343, 353 (2d Cir. 2022) (cleaned up).  Put differently, a complaint must detail "***why*** the

statements were fraudulent."  *Id.* (emphasis in original).  Plaintiffs have not done so.

#### 1.    Plaintiffs Fail to Challenge the "Segmentation" Strategy Statements

##### (a)    Statements Concerning Magic's Growth in 2021 and 2022

Plaintiffs first allege that between September 16, 2021, and December 8, 2022,

Defendants falsely attributed Magic's growth to Hasbro's "segmentation strategy," under which

Hasbro developed Magic products for distinct player segments, as opposed to just competitive

players as it historically had done.  (AC ¶¶ 144, 146, 150, 157.)  Plaintiffs claim that Hasbro

---

[5] Should the Court dismiss only Williams from the case, it should also dismiss any claims based
on her alleged statements.  (*See* AC ¶¶ 152-53, 157-62.)  *Cf. Janus Cap. Grp., Inc. v. First
Derivative Traders*, 564 U.S. 135, 141-44 (2011).

[6] Plaintiffs do not allege any "deceptive acts that are distinct" from the alleged
misrepresentations.  *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11
F.4th 90, 105 n.6 (2d Cir. 2021); *see also Lentell*, 396 F.3d at 177 (dismissing scheme-liability
claims when the "sole basis" for them was "alleged misrepresentations").  Accordingly,
Defendants analyze the AC solely under Rule 10b-5(b).

actually "drove Magic's growth by unsustainably overprinting 'parachute' sets to generate short-term revenue to make up for shortfalls in its Consumer Products business and elsewhere in the Company." (*Id.* ¶¶ 145, 147, 151, 158.)

As a threshold matter, Plaintiffs do not explain how the two alleged strategies are inconsistent with each other. Nor could they, since the two alleged strategies are not "mutually exclusive," and one does not show that the other was false. *Canada Goose*, 2021 WL 3077469, at *8; *see also In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 532 (S.D.N.Y. 2015) (no misrepresentation when two statements were "not inconsistent" with one another), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016). Even if Hasbro timed the releases of the alleged "parachute sets" around the results from other business segments, that does not mean that those Magic sets were not targeted at specific player segments or a broader player base.

Plaintiffs also do not plead particularized facts showing that any of the challenged statements concerning Hasbro's segmentation strategy "were misleading or false when made." *Canada Goose*, 2021 WL 3077469, at *8. Indeed, nothing in the AC contradicts that "serving more player segments than ever before" was "the reason the Company had 'either tripled or come close to triple the overall Magic business'" between 2016 and the end of 2022. (AC ¶ 157 (cleaned up); *see also* Ex. C, 12/8/22 Special Call, at 7, 9-10.) Highlighting the AC's defects, Plaintiffs allege that Cocks misrepresented that the "Secret Lair card drops [were] for the collector segment" (AC ¶ 148 (cleaned up)), but they do not allege any facts supporting a plausible inference that Secret Lair sets were ***not*** targeted at collectors. (*Cf., e.g.*, Ex. D, 9/16/21 Investor Call, at 6.) Instead, Plaintiffs merely assert that the Secret Lair sets were "full of reprinted cards." (AC ¶ 149.) That allegation does not contradict Cocks's actual statement.

Further, any suggestion that Defendants misleadingly used Magic to cover up shortfalls

in other business segments (e.g., Consumer Products), is belied by Hasbro's own financial statements, which since before the Class Period have reported the Company's financial results on a segment-by-segment basis for each of its three business segments. (*See, e.g.*, Ex. O, 2022 10-K, at 16, 49-53, 92; Ex. F, 2/16/23 8-K, at 7-8.) Investors were acutely aware that, despite Magic's record-breaking success in 2022, Hasbro's Consumer Products segment struggled in 2022, with full-year revenue down 10% compared to 2021, and fourth-quarter revenue down 26% year over year. (AC ¶¶ 119-20; Ex. I, 1/27/23 8-K, at 4.) "Even at the pleadings stage, dismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed." *Docdeer Found. v. BioNTech SE*, No. 24 Civ. 5310 (KPF), 2025 WL 2781381, at *14 (S.D.N.Y. Sept. 30, 2025).

(b)    Statements Concerning "Overprinting"

Plaintiffs next claim that Defendants falsely denied overprinting Magic cards. First, Plaintiffs assert that Williams falsely stated during an October 18, 2022 earnings call that Hasbro was releasing "the same number of sets" each year "in the hobby channel." (AC ¶ 152.) Plaintiffs contend that, through this statement, Williams misleadingly "represent[ed] that the number of Magic sets printed annually was sustainable." (*Id.* ¶ 153.) But Williams made no representations about the "sustainab[ility]" of Hasbro's printing of Magic cards. "Plaintiffs cannot make up statements and then attribute them to defendants in order to support a Section 10(b) claim." *In re Stemline Therapeutics, Inc. Sec. Litig.*, 313 F. Supp. 3d 543, 549 (S.D.N.Y. 2018). And Plaintiffs do not plead any facts contradicting Williams's actual statement, which concerned "hobby channel" releases—i.e., sales made to hobby stores, as opposed to "direct-to-consumer" releases like the "secret la[ir] drops." (Ex. G, 3Q22 Earnings Call, at 18.)[7]

---

[7] Even if Williams's statement could be characterized as a statement concerning future player

Second, Plaintiffs allege that Williams falsely assured investors after the Report that "there is no evidence that Magic is overprinted," and that Hasbro "print[s] and reprint[s] products to meet demand from our players." (AC ¶ 159.)  Plaintiffs assert that when Williams made these statements, "demand for Magic was waning and Magic set sales were consistently missing Hasbro's internal forecasts." (*Id.* ¶ 160.)  Plaintiffs' conclusory assertions are meritless and lack any supporting factual allegations.

For example, Plaintiffs plead no particularized facts to quantify the extent to which "demand for Magic" was purportedly "waning" or show that Hasbro's printing of Magic cards exceeded demand.  Instead, Plaintiffs identify ***only two of the thirty-nine*** alleged Magic "sets" purportedly released in 2022 that they claim experienced "weaker than expected" sales:  (1) the "Baldur's Gate" multi-player "Commander" product "released in June 2022," and (2) the Magic 30th Set released on November 28, 2022.  (*Id.* ¶¶ 86, 97-98, 108.)  These two exemplars hardly show that Hasbro was overprinting Magic cards and failing to account for demand.  Plaintiffs also ignore the context for Williams's statement, including her concurrent statements that (i) Hasbro gauges demand based on "reorders" after the "initial selling period prior to the launch of a set," (ii) Magic was on track to become Hasbro's "first $1 billion brand" in 2022, and (iii) the "Universes Beyond" Warhammer 40,000 "Commander" deck was "already on its third reprint due to demand." (Ex. C, 12/8/22 Special Call, at 10, 11, 13.)  From this context, Williams explained that Hasbro had "expanded the number of booster product types" around "each of the [six annual tentpole set] releases" and rejected that Magic was "overprinted." (*Id.* at 9, 10.)  Defendants' statements must be "taken together" and examined "in context." *Canada*

---

demand or business performance, it is protected by the PSLRA's safe harbor and the "bespeaks caution" doctrine.  *See* 15 U.S.C. § 78u-5; *In re Philip Morris Int'l Inc. Sec. Litig.*, 437 F. Supp. 3d 329, 354-56 & n.7 (S.D.N.Y. 2020), *aff'd*, 89 F.4th 408 (2d Cir. 2023).

*Goose*, 2021 WL 3077469, at *7.

Plaintiffs also do not identify any "internal forecast" for "Magic set sales" that Hasbro "missed." (AC ¶ 160.) Instead, Plaintiffs point to FE4's vague account that Cocks and Williams were shown unspecified "metrics" at certain unspecified "executive leadership team meetings" showing how "sales of Magic sets were trending against Hasbro's sales and demand forecasts." (*Id.* ¶¶ 101-02.) FE4's account is too non-specific to show that Williams's "statements were false ***when they were made***." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 579 (S.D.N.Y. 2014) (original emphasis), *aff'd*, 604 F. App'x 62 (2d Cir. 2015); *accord Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 799 & n.20 (S.D.N.Y. 2020). It also fails to contradict any of the alleged misrepresentations.

Finally, insofar as Plaintiffs contend that Hasbro's product strategy and purported "overprint[ing]" risked "long-term harm to the Magic brand" (AC ¶ 160), "[t]hat is a complaint about strategy, not disclosures as required by securities laws." *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 250 (S.D.N.Y. 2020) (citing *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995)). So even if Plaintiffs disagree with Hasbro's strategy, that disagreement does not support a claim.

### 2. Plaintiffs' Focus on the Magic 30th Set Is Misguided

Plaintiffs next claim that Defendants misrepresented the success of the Magic 30th Set, including by posting an "out of stock" message on Wizards's ***player-facing website*** after "prematurely cut[ting] off sales" because "initial sales velocities indicated that the set was not selling well." (AC ¶¶ 154-55.) In so doing, Plaintiffs ignore Defendants' transparency with investors about the Magic 30th Set's performance. During the December 8, 2022 investor call, Williams explained that Hasbro had "scaled back the expected supply" of the Magic 30th Set in response to "customer feedback." (Ex. C, 12/8/22 Special Call, at 11; AC ¶ 161.) And on

17

Hasbro's next earnings call on February 16, 2023, Cocks reiterated that Hasbro was "too aggressive in some of [its] pricing assumptions" for the Magic 30th Set and thus "pulled back on available supply." (Ex. A, 4Q22 Earnings Call, at 5.)

These statements are wholly consistent with Plaintiffs' allegations that Hasbro "cut off sales of the Magic 30th Set" due to "slow sales velocities immediately after its release." (AC ¶ 162.) Indeed, having "pulled back" the supply for the release, the Magic 30th Set was no longer available for sale on the Wizards website, and thus "out of stock" if someone tried to buy it. Defendants **never** represented, as Plaintiffs allege, that "sales of the set were strong" or that the Magic 30th Set had "sold out." (*Id.* ¶¶ 9, 13.) Thus, the FE accounts that Plaintiffs offer to purportedly corroborate that the Magic 30th Set had not in fact "sold out" do nothing to advance Plaintiffs' claims. (*See id.* ¶¶ 108-13.)

Plaintiffs also fail to plead any facts supporting a "substantial likelihood that a reasonable shareholder would consider" an "out of stock" indicator on the Magic 30th Set's player-facing website "important in deciding how to act" when considering a purchase or sale of Hasbro securities. *ECA v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (cleaned up). Indeed, nothing in the AC even suggests that investors would look to Wizards's player-facing website for information about Hasbro's business. (*See* AC ¶¶ 167-71.) Materiality is "a meaningful pleading obstacle," and courts may dismiss securities claims when an alleged misrepresentation was "so obviously unimportant to a reasonable investor that reasonable minds would agree on that [statement's] unimportance." *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013). Especially considering that Hasbro disclosed that the Magic 30th Set was intended to be a limited-run, "direct-to-consumer" "collector product" (Ex. P, 10/4/22 Investor Call, at 18), and, according to Plaintiffs, just **one of thirty-nine** "set" releases for the year (AC

18

¶ 42), Plaintiffs have not pled any facts suggesting that Hasbro expected, or that a reasonable investor would expect, that the "out of stock" message on the Magic 30th Set website "might result in a significant market reaction." *ECA*, 553 F.3d at 205.  No reasonable investor would view the "out of stock" message "as having significantly altered the import of the total mix of information" that Hasbro made available about its business.  *ProShares*, 728 F.3d at 104.

### 3.    Plaintiffs Fail to Challenge the 1Q23 Inventory Statements

Finally, Plaintiffs claim that when Defendants reported Hasbro's 1Q23 results, they misrepresented the state of Hasbro's Magic inventory.  (AC ¶¶ 163-66.)  First, Plaintiffs allege that Cocks and Thomas (who is not a defendant), misrepresented on Hasbro's April 27, 2023 earnings call that Wizards inventories were "up a bit" due to "the timing of [Magic] releases *this year*."  (*Id.* ¶ 163.)  Second, Plaintiffs allege that Hasbro misrepresented in its 1Q23 quarterly report that the 11% increase in Hasbro's inventories "*during the first quarter of 2023*" was "driven primarily by higher inventory balances" in the Wizards segment, "most notably in anticipation of several upcoming [Magic] set releases."  (Ex. Q, 1Q23 10-Q, at 37 AC ¶ 165.)

Plaintiffs do not (and cannot) plead any particularized facts to show that these statements "were misleading or false *when made*."  *Canada Goose*, 2021 WL 3077469, at *8.  Instead, Plaintiffs point to allegedly "disappointing Magic sales *during 2022*" for just two of the thirty-nine total "sets" allegedly released that year:  Baldur's Gate in "mid-2022" and the Magic 30th Set "in November 2022."  (AC ¶¶ 164, 166.)  But nothing in the AC contradicts that, "*during the first quarter of 2023*," Hasbro had increased its Magic inventory ahead of anticipated 2023 set releases, including the expected "March of the Machines release [in] mid-April" and "Universes Beyond: The Lord of the Rings, Tales of the Middle-Earth shortly before the start of Q3."  (*Id.* ¶¶ 163, 165.)  For example, Plaintiffs do not plead any facts to plausibly suggest that the anticipated 2023 Magic sets contained existing cards from "old Magic sets" that "had gone

unsold." (*Id.* ¶¶ 164, 166.)  "[W]ithout ***contemporaneous*** falsity, there can be no fraud."

*Lululemon*, 14 F. Supp. 3d at 571 (original emphasis).

**B.**    **Plaintiffs Have Not Pled Scienter**

The AC should also be dismissed because Plaintiffs "fail to allege with particularity facts

giving rise to a strong inference of scienter." *Bristol-Myers Squibb*, 28 F.4th at 355; *see also* 15

U.S.C. § 78u-4(b)(2)(A).  This inference "must be more than merely plausible or reasonable—it

must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."

*Tellabs*, 551 U.S. at 309.  To plead scienter, "a complaint must allege facts showing (1) that

defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial

evidence of conscious misbehavior or recklessness." *Bristol-Myers Squibb*, 28 F.4th at 355.

Plaintiffs plead neither, and the inference of nonfraudulent intent is more compelling.

**1.**    **Plaintiffs' Scienter Allegations Fail Under the PSLRA**

"Plaintiffs point to ***no facts*** suggesting that Defendants had a motive to make fraudulent

misstatements." *Pretium*, 256 F. Supp. 3d at 480.  For example, Plaintiffs do not allege that

Cocks or Williams "sold any company stock" before the purported corrective disclosures or that

they otherwise "directly profited from the alleged misstatements." *Id.*  Consequently, Plaintiffs'

burden to plead conscious misbehavior or recklessness is "correspondingly greater." *Bristol-*

*Myers Squibb*, 28 F.4th at 355.  Recklessness is "a state of mind approximating actual intent,"

requiring particularized facts showing "highly unreasonable" conduct—"an extreme departure

from the standards of ordinary care," in that the alleged misrepresentations were "either known

to the defendant[s] or so obvious that the defendant[s] must have been aware of [them]." *City of*

*Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014).

Here, Plaintiffs' "allegations of conscious misbehavior or recklessness are virtually

nonexistent." *Sachsenberg*, 339 F. Supp. 3d at 184.  "Second Circuit cases uniformly rely on

allegations that [1] **specific contradictory information** was available to the defendants [2] ***at the same time*** they made their misleading statements." *Canada Goose*, 2021 WL 3077469, at *11. Far from carrying their burden, Plaintiffs rely on "a hodgepodge of circumstantial evidence" that "fails to indicate that Defendants had any specific contradictory information in their possession when they made their statements during the class period." *Id.*

Plaintiffs allege that Cocks and Williams (i) "oversaw" and "implement[ed]" the supposed "parachute strategy" as the CEO of Hasbro and the President of Wizards, respectively, (ii) were "extensively involved" with Wizards and "deeply familiar with the Company's Magic business," and (iii) "regularly addressed market analysts and investors regarding Hasbro's business" on earnings calls and at industry conferences.  (AC ¶¶ 173-76, 203-06.)  According to Plaintiffs, "[i]t is implausible that Defendants were unaware of the fundamental details about Hasbro's business strategies that comprised the topics of the" alleged misrepresentations.  (*Id.* ¶ 203.)  "[A]ccusations founded on nothing more than a defendant's corporate position," however, "are entitled to no weight."  *Shemian v. Rsch. In Motion Ltd.*, No. 11 Civ. 4068(RJS), 2013 WL 1285779, at *17 (S.D.N.Y. Mar. 29, 2013), *aff'd*, 570 F. App'x 32 (2d Cir. 2014).  And the alleged "parachute strategy" does not even contradict any of the alleged misrepresentations (*supra* Part II.A.1.a), so Defendants' knowledge of that strategy cannot plausibly suggest any intent to defraud investors.

Plaintiffs also fail to plead particularized facts showing that Defendants believed that Hasbro had overprinted Magic cards and lied to investors about that fact during the December 8, 2022 investor call.  (AC ¶¶ 159-60.)  At best, Plaintiffs allege that at unspecified times in the "second half of 2022," Williams "expressed concern" about (i) the Magic "production slate" in connection with Hasbro's "long-range planning" and (ii) whether distributors would "have

sufficient cash flow to purchase new Magic sets." (*Id.* ¶¶ 180, 188.)  But Plaintiffs do not allege

that Defendants made any misrepresentations about distributor buying, and FE1's vague account

about Williams's purported "concerns" is no substitute for specific facts contradicting

Williams's belief that Hasbro had not overprinted Magic cards in 2022.  *See In re PXRE Grp.,*

*Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 539 (S.D.N.Y. 2009) ("concerns" of a "general nature" are

insufficient), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009).

Equally deficient are the allegations of vague, supposed "concerns" from unidentified

"hobby shops and end consumers" that FE2—a low-level "Community Manager"—purportedly

"relayed" to Williams at an unspecified "town hall meeting."  (AC ¶¶ 87 & n.3, 186-87.)  Not

only are FE2's reported "concerns" too vague to be considered "specific contradictory

information," *Canada Goose*, 2021 WL 3077469, at *11, but "allegations about an unspecified

time" also cannot supply the requisite "specific contradictory facts available to Defendants at the

time of an alleged misstatement," *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352

(S.D.N.Y. 2011).

Likewise, FE4's vague account about unspecified "metrics" that Defendants allegedly

received at unspecified meetings in the "latter half of 2022 and into 2023" concerning Magic

sales are far too generalized to support a plausible inference that Defendants knew that Hasbro

had "overprint[ed]" Magic sets in 2022 and lied about it.  (AC ¶¶ 189-91.)  "[W]here plaintiffs

contend defendants had access to contrary facts, they must ***specifically identify*** the reports or

statements containing this information." *Teamsters Loc. 445 Freight Div. Pension Fund v.*

*Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008).  That Defendants allegedly "instructed

Wizards personnel to reevaluate the 'economy' for printing Magic sets," including after the

Report, simply suggests good business sense, not fraudulent intent.  (AC ¶¶ 192, 195.)  And even

if certain unspecified members of "Company leadership" believed that Hasbro's business strategies were "diluting the [Magic] franchise" (*id.* ¶ 195), "differences of opinion, even stark differences . . . do not reveal scienter." *Pretium*, 256 F. Supp. 3d at 481 (ellipses in original).

Finally, Plaintiffs do not plead any particularized facts supporting a plausible inference that Defendants intended to deceive anyone, much less ***investors***, through the "out of stock" icon on the Magic 30th Set's player-facing website. (AC ¶¶ 197-200.) Defendants were transparent with investors that they had pulled back available supply of the Magic 30th Set and that it was overpriced in hindsight. (*Supra* Part II.A.2.) "[T]he facts alleged must support an inference of an intent to defraud ***the plaintiffs***," i.e., Hasbro's stockholders, "rather than some other group," like Magic fans. *ECA*, 553 F.3d at 198. Plaintiffs fail that burden here.[8]

## 2. Any Inference of Scienter Is Less Compelling Than Any Opposing Inferences of Nonfraudulent Intent

Even "taken collectively," Plaintiffs' allegations do not support an inference of scienter that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 322-24. According to Plaintiffs, although Magic experienced explosive growth for the better part of a decade, Cocks falsely attributed Magic's historic success to the "segmentation" strategy and misled investors about Magic's role in Hasbro's business (while at the same time reporting Hasbro's financial results on a segmented basis). (AC ¶¶ 4, 157.) Then, in February 2022, when Cocks took over as Hasbro's CEO and Williams became President of Wizards, Williams learned of Hasbro's purportedly unsustainable

---

[8] Without other allegations supporting a cogent inference that Defendants acted with conscious misbehavior or recklessness, Plaintiffs' cursory effort to invoke the "core operations" doctrine (AC ¶¶ 201-02) fails. *See Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020) ("naked assertion" that product was a "key product" and thus of "core importance" to company was "plainly insufficient to raise a strong inference" of scienter); *Sachsenberg*, 339 F. Supp. 3d at 184 ("without other evidence of conscious misbehavior or recklessness," plaintiffs cannot "rely on the 'core operations' doctrine to save [their] claim").

"overprinting" strategy for Magic, "expressed concern" about it, and yet continued the alleged fraud without any motive to do so.  (*Id.* ¶¶ 40, 175, 180.)  And when the Report allegedly "revealed" the supposed fraud, Cocks and Williams continued to cause Hasbro to overprint Magic cards and lie to the market about it, all the while knowing that Hasbro's first billion-dollar brand had no chance of future success.  (*Id.* ¶¶ 49, 65-68.)  None of that makes any sense. "[T]he PSLRA neither allows nor requires [courts] to check [their] disbelief at the door." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020); *see also Kalnit v. Eichler*, 264 F.3d 131, 140-41 (2d Cir. 2001) ("Where plaintiff's view of the facts defies economic reason, it does not yield a reasonable inference of fraudulent intent." (cleaned up)).

The far more compelling inference from the facts alleged is one of nonfraudulent intent: (i) the segmentation strategy actually drove Magic's explosive growth; (ii) Defendants genuinely (and in hindsight correctly) believed that the strategy would continue to propel Magic's growth and that Magic was not "overprinted;" (iii) the "segmentation" and "parachute" strategies were both believed to be (and were) part of a successful brand strategy; (iv) disclosed pandemic-related supply chain issues disrupted Magic's 2022 release cadence; (v) the Magic 30th Set did not sell like Hasbro hoped it would; and (vi) Hasbro's Consumer Products segment struggled in 2022 and 2023, coming off the heels of the global pandemic, prompting Hasbro to pursue organizational changes.  At bottom, while Plaintiffs appear to believe that the "segmentation" strategy was poorly contrived, resulted in inventory that Hasbro could not sell, and negatively impacted the Magic brand, Plaintiffs' gripe reflects no more than a disagreement with business strategy, not securities fraud.  *See Lululemon*, 14 F. Supp. 3d at 562.

C.    **Plaintiffs Have Not Pled Loss Causation**

Plaintiffs also fail to plead loss causation—i.e., that the alleged misrepresentations "concealed something from the market that, when disclosed, negatively affected the value of"

Hasbro's stock.  *Lentell*, 396 F.3d at 173.  Plaintiffs claim to have suffered damages from three

purported corrective disclosures:  (1) the Report published on November 14, 2022, (2) Hasbro's

January 26, 2023 preview of its 2022 financial results, and (3) Hasbro's October 26, 2023

earnings report and related investor call.  (AC ¶¶ 209-21.)  To be "corrective," and thus support

loss causation, a disclosure must "possess[] a sufficient nexus to a prior misstatement" that it

"reveals at least part of the falsity of that misstatement."  *In re UiPath, Inc. Sec. Litig.*, No. 24

Civ. 4702 (JPC), 2025 WL 2065093, at *18 (S.D.N.Y. July 23, 2025) (collecting cases).  None

of the alleged disclosures fits this bill.

First, the third-party Report reflects only a single analyst's "concern" that Hasbro was

"overproducing Magic cards" in a manner that he believed could "destroy[] the long-term value

of the brand."  (Ex. H, Report, at 1.)  The Report was forward-looking, and did not reveal that

Defendants had falsely attributed Magic's ***historic*** growth to Hasbro's "segmentation" strategy.

(*Compare id.*, *with* AC ¶¶ 144-51.)  Though the Report commented on the number of "sets" that

Hasbro released each year between 2017 and 2022 (Ex. H, Report, at 4), it did not contradict

Williams's October 18, 2022 statement that Hasbro was releasing "the same number of sets"

each year "***in the hobby channel***," i.e., to hobby stores through distributors.  (AC ¶ 152.)

Rather, the Report remarked that "[m]any of the incremental releases have come in the form of

box sets which are smaller releases, ***often sold directly by Wizards on its Secret Lair website***."

(Ex. H, Report, at 4.)  This purported revelation is entirely consistent with Williams's

contextualization that Hasbro's "secret [lair] drops . . . are direct-to-consumer," and thus not "in

the hobby channel."  (Ex. G, 3Q22 Earnings Call, at 18.)

Second, "there is no logical connection between" Hasbro's January 26, 2023 preview of

its 2022 financial results and any of the prior challenged statements.  *Plumbers, Pipefitters &*

*MES Loc. Union No. 392 Pension Fund v. Fairfax Fin. Holdings, Ltd.*, 886 F. Supp. 2d 328, 338

(S.D.N.Y. 2012).  The January 26 press release said nothing about the "segmentation" strategy,

Magic's historical growth, the Magic 30th Set, or whether Magic was "overprinted."  (AC

¶¶ 144-62.)  Rather, Hasbro reported that (i) "[d]espite strong growth" for Wizards, its

"***Consumer Products*** business underperformed in the fourth quarter" and was "down 26% year-

over-year" relative to 4Q21, (ii) Hasbro would be eliminating "approximately 15% of its global

workforce," and (iii) Hasbro's President and COO, who oversaw the Consumer Products

division, would be "departing."  (Ex. I, 1/27/23 8-K, at 3-4.)  As in *Lentell* and *UiPath*, "the

alleged loss here followed a disclosure of business underperformance"—for a different business

segment no less—and "not any revelation that Defendants' [prior statements] were false or

misleading."  *UiPath*, 2025 WL 2065093, at *21.  "That is simply not enough."  *Born v.*

*Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 494 (S.D.N.Y. 2021).

      Plaintiffs assert that the January 26 disclosure revealed that Wizards's phenomenal ***22%***

***year-over-year fourth-quarter growth*** had still "missed Hasbro's guidance and analysts'

expectations."  (AC ¶ 212.)  Yet Plaintiffs do not cite any specific Hasbro guidance (as opposed

to analyst expectations) that was missed or that they even claim was false or misleading.  And

missed "***analysts'*** expectations" certainly cannot support a claim.  Even if Wizards "fell short of

[Hasbro's] expectations" (and it did not), that "does not retroactively render the [prior]

statements false or misleading."  *UiPath*, 2025 WL 2065093, at *19.  Indeed, in the loss-

causation context, the alleged missed expectations "reflected no contradiction, no correction, and

no concession of past inaccuracy," and thus the "purported nexus between" the January 26

disclosure and Defendants' prior statements "is far too dubious to support a finding of

causation."  *Id.* at *19.  "Plaintiffs must do more than simply point to missed earnings forecasts

or other 'bad news' to plead loss causation." *In re Francesca's Holdings Corp. Sec. Litig.*, No. 13-cv-6882 (RJS), 2015 WL 1600464, at *21 (S.D.N.Y. Mar. 31, 2015).

Finally, the October 26, 2023 earnings report and related call did not reveal the falsity of any of Defendants' prior statements, including the inventory-related statements on the 1Q23 earnings call and in the 1Q23 quarterly report. (AC ¶¶ 163-66.) To the contrary, the report and call were entirely consistent with Defendants' prior statements. Plaintiffs allege that the disclosure of "a $50 million 'onetime cost' to 'move through inventory'" revealed "stubbornly elevated" Wizards inventories from "unsold past Magic sets" and the "extent of the harm to Magic sales that had been caused by Hasbro's Magic set overprinting." (*Id.* ¶¶ 17, 138, 217.) It did no such thing. Hasbro explained that the $50 million "onetime cost" to "move through inventory" was specifically attributable to "***the Consumer Products business***," not Magic. (Ex. L, 3Q23 Earnings Call, at 13.) Plaintiffs also ignore that Hasbro reported ***20% year-over-year growth*** for Magic relative to 3Q22, despite an 18% decline in Consumer Products and a 42% decline in Entertainment, which drove a company-wide revenue decline of 10%. (Ex. K, 10/26/23 8-K, at 5, 7.) Because the October 26 disclosures "did not reveal any 'relevant truth' about the purported fraud," they "cannot establish loss causation." *Janbay v. Canadian Solar, Inc.*, No. 10 Civ. 4430 (RWS), 2012 WL 1080306, at *15 (S.D.N.Y. Mar. 30, 2012).

## III.    PLAINTIFFS HAVE NOT PLED A CLAIM UNDER SECTION 20(A)

Plaintiffs' failure to state a primary violation under Section 10(b) precludes their "control person" claim under Section 20(a) (Count III). *ATSI*, 493 F.3d at 108.

## CONCLUSION

For these reasons, the AC should be dismissed in its entirety with prejudice. *See UBS*, 752 F.3d at 188 (affirming dismissal and denial of leave to amend).

Dated: New York, New York
      February 6, 2026

Respectfully submitted,

 /s/ Scott D. Musoff                  
Scott D. Musoff
Christopher R. Fredmonski
Jemma M. Curtin
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
(212) 735-3000
scott.musoff@skadden.com
christopher.fredmonski@skadden.com
jemma.curtin@skadden.com

*Attorneys for Defendants Hasbro, Inc.,*
*Christian Cocks, and Cynthia Williams*

## **LOCAL RULE 7.1(C) CERTIFICATION**

I, Scott D. Musoff, hereby certify that this memorandum of law complies with the word-count limitations set forth in Rule 7.1(c) of the Local Rules of the United States District Court for the Southern District of New York and Section 4(B) of the Court's Individual Rules & Practices in Civil Cases, and contains 8,713 words, exclusive of the caption, table of contents, table of authorities, signature blocks, and this certificate.

Dated: New York, New York
February 6, 2026

/s/ Scott D. Musoff
Scott D. Musoff